THE WATERBURY TRUST COMPANY, TRUSTEE (WILL OF DAVID G. PORTER) v. NATHAN T. PORTER, JR., ET AL.

BROWN, JENNINGS, ELLS, DICKENSON and O'SULLIVAN, JS.

Argued May 4—decided July 19, 1944.

*Walter F. Torrance,* for the appellant (plaintiff).

*Harry L. Brooks,* assistant attorney general, with whom, on the brief, was *Joseph P. Smith,* for the appellant (defendant Francis A. Pallotti, attorney general).

*J. Warren Upson,* with whom, on the brief, was *Lawrence L. Lewis,* as amicus curiae.

*John M. Comley, Charles M. Lyman* and *John D. Thoms,* for the appellees (named defendant et al).

O'Sullivan, J. David G. Porter, who was born at Waterbury, died in 1905 at the age of seventy-two, leaving a will executed during 1904, the relevant parts of which are incorporated in the footnote.[1] Other than those of the half blood, he had four brothers, all of whom were married and each of whom had at least

[1] All the rest, residue and remainder of my estate real and personal I give, devise and bequeath to Cornelius Tracy, Albert D. Field, Charles L. Holmes, Edwy E. Benedict, Helen P. Camp and Margaret Torrance Holmes wife of Walter W. Holmes in Trust for the purpose hereinafter stated.

I direct that the realty of which I may die possessed shall be sold or rented at the discretion of the trustees, and the proceeds invested, retaining however the land west of the Meriden Road for the location of buildings, campus and other grounds of the institution which it is the purpose of this trust to establish.

When the accumulation, increased by possible contributions, donations or bequests from other sources, shall be deemed sufficient for the purpose, the trustees shall establish a school or college on the portion of land above designated to be operated according to the following plan.

The courses of study in the institution may be literary and classical, or scientific and technical, or both, but shall in any case be made up of six-month winter terms for young men, extending from October first to April first, these dates being movable at the discretion of the trustees, but so as to comprise not less than six months inclusive of a holiday recess of not more than one week, and shall be arranged so as to rise in grade, each succeeding term or year above the preceding, and covering a period of not less than three, nor more than six years.

The courses of study for young women shall be made up of summer terms of not less than three months each, and shall extend

one child.  He was graduated from Yale College and, after teaching a year at the University of Rochester, took up his residence at Waterbury in the house his father had built many years before.  There he lived until he died, at first with his mother, then, following her death, by himself, and finally with his mentally ill brother, Nathan.  The other three brothers were in circumstances far more affluent than he and from time to time he was wont to accept financial assistance from them.  Mr. Porter was a shy man, undemonstrative and reticent.  He remained a bachelor all his life. With his brothers and their families he was always on intimate terms and was never heard to speak unkindly of them.  He was particularly fond of his only

over a period of not more than four years; and as far as practicable, special prominence shall be given in these courses to the theory and practice of domestic science, literature and modern languages; and a study of the constellations of the visible heavens and of ornithology shall be included.

The trust here created shall be perpetual, the majority of the trustees having power to fill vacancies caused by death, resignation or otherwise, and they shall also have power to increase their number to seven or nine or more, and they may elect women as trustees to a proportion not greater than one third of the whole number.

\*　　\*　　\*　　\*　　\*

[The following explanatory note was appended to the will and, with it, was admitted to probate.  It was signed but not witnessed.]

The purpose of the residuary legacy is to provide for the beginning of a school or college to be operated on a plan by which young men can earn during the six summer months what they will need to spend at college during the other six months of the year; in order that capable young men who are so disposed can secure a liberal education independently, and of their own resources, without incurring debt or the risk of injury to health by attempting double work; and so that young women can receive such instruction in college courses as shall be fitted to their circumstances and needs under similar conditions, but without what is termed coeducation. And the school or college may be opened for the reception of students as soon as sufficient buildings can be provided and a capable and reliable president or principal can be secured who will undertake the work under the conditions imposed; and the provisions and conditions of the legacy are to be interpreted according to this general plan and purpose.  Tuitions may be charged, and the school begun on a comparatively low grade of studies, the courses to be advanced as circumstances may seem to require or warrant, but care should be taken at all times not to overcrowd the courses of study.

niece, who, during her teens, paid him many visits, although when she moved to New Jersey following her marriage in 1896 her trips to Waterbury became less frequent.

Mr. Porter was a gentleman of intellectual attainments, but in the manual arts he was extremely deficient. He was an enthusiastic reader and writer. About 1872 he began to publish some of his essays. These dealt almost entirely with religion and collegiate education, subjects on which he entertained definite and fixed opinions. This was characteristic of him, for, whenever he took a position upon a matter of any concern, it was difficult to persuade him to alter his view. Save for his one year at teaching, he took no active part in the field of education and during his life made no financial contribution to its advancement. More than thirty years before he died, he published an article in which he unfolded the scheme of the institution he provided for in his will.

Shortly before his death, he formed an intimate friendship with the Reverend Oscar Haywood, the minister of the Baptist church he attended. In the course of the many visits the minister made to the Porter home, the two men would embark on scholarly conversation whose main themes were religion and education. Mr. Haywood was familiar with the terms of the proposed will, since it was often a topic of discussion. After it was executed, the testator became interested in a plan fostered by his friend to establish a nonsectarian evening school to be maintained by the church, where a variety of practical subjects of high school standard was to be taught. He contributed suggestions but died before the school was established.

In speaking of his ambition to found the school he had conceived, Mr. Porter recognized the insufficiency of his estate to attain this objective and expressed the

hope that gifts from public-spirited citizens in the community might make the project feasible. Mr. Haywood assured him by promising to solicit funds after his friend's death, a task he in fact attempted but without success, and since then the trust fund has not been aided by the receipt of any gift.

The institution which the testator sought to establish is described in his will. The method he selected lay in a gift of his residuary estate to several trustees, all of whom have since died and have been succeeded by the plaintiff. The gift consisted partly of realty and partly of personalty, and its approximate value, in 1906, was $30,000. Of the realty, that which was located at Waterbury on the Meriden Road, a tract of land his grandfather had acquired in 1808, he designated as the site for the buildings and campus. The scope and character of the proposed institution are outlined in considerable detail. For example, the courses of study for young men are to be either literary and classical, or scientific and technical, or both, and are to cover not less than three nor more than six years. Each semester is to run for six consecutive months, to be followed by a rise in grade. The succeeding six months are to be devoted by the students to work, the purpose being, as expressed by the testator in an explanatory clause, to operate "on a plan by which young men can earn during the six summer months what they will need to spend at college during the other six months of the year ... without incurring debt or the risk of injury to health."

For young women, the institution is to provide courses of not over four years duration, but the yearly term is to be compressed into three summer months, when the young men will not be in attendance at the institution, for the testator was opposed to coeducation. The courses for the women contemplate domes-

tic science, literature, modern languages, astronomy and ornithology. He authorized the charging of tuition, if necessary, and provided that the institution should be opened as soon as sufficient buildings could be provided and a capable president secured, "who will undertake the work under the conditions imposed."

Mainly through unusually advantageous sales of the alienable realty and certain shares of stock, the fund has grown since 1906 to $196,000. During the past decade the yearly increase has approximated $3300 after the payment of expenses of administration, which for some reason undisclosed by the record have averaged $4100 annually. There is no expectation of further immediate substantial gain and it is highly improbable that the future will show any growth at all comparable to that of the past. The fund is adequate to erect a relatively small building, but to maintain and operate it will require over $30,000 annually. This yearly need cannot be met except through the charging of tuition. Since there is no indication that a substantial number of students will be available if the school is founded, the size of the tuition will be prohibitive. The sum of $750,000 is necessary, when placed at 4 per cent interest, to provide for the annual outlay for operation, exclusive of repairs and depreciation.

The General Assembly of the State of Connecticut has appropriated $250,000 to defray the cost of equipping a state trade school in the city of Waterbury, but the use of this appropriation is subject to the condition that the city shall erect a suitable building for the school. The Assembly has authorized the city to issue its bonds to the amount of $100,000 for this purpose, but the amount is inadequate. The plaintiff has been requested by the mayor of Waterbury to turn over the

trust fund to the proper authorities so that, with the money available to the city from the sale of its bonds, ample resources may be on hand to erect the building. Thereafter its maintenance will be assumed by the state.

Trade schools are utilitarian in nature, secondary rather than collegiate in scope and coeducational in administration. The normal course is completed in less than three years and there is no periodically rising system of grades. One month is allowed for vacational purposes. The schools are under state supervision and are subject to varying policies. Other facts sought to be added to the finding will not improve the position of the appellants.

The plaintiff trustee seeks to have determined (a) whether the doctrine of approximation warrants it in turning over the trust fund, in whole or in part, to the municipal authorities for the purpose of permitting its use in the erection of a trade school; (b) whether the trustee shall continue to hold the fund and, by accumulating the interest, permit its growth until it becomes ample to attain the exact purposes of the testator; and (c) whether the testator's heirs-at-law have any interest in the trust fund. The trial court adjudged (a) that the doctrine of approximation is not applicable, (b) that the trust may not now be carried out, and (c) that "the entire residual estate of David G. Porter ought to be distributed to the heirs at law" of the testator. The trustee and the defendant attorney general have appealed from the judgment.

The trust undertaken to be created by the testator is a charitable one, as its object is the education of youth. *Hoyt* v. *Bliss*, 93 Conn. 344, 350, 105 Atl. 699. The quality of its purpose is sustainable upon the broad ground that the education of individuals advances the cause of civilization and humanity. *West-*

*port Bank & Trust Co.* v. *Fable,* 126 Conn. 665, 673, 13 Atl. (2d) 862. That the trustees are authorized to charge tuition does not destroy its charitable nature, since there is no intention that any personal profit shall inure. 2 Bogert, Trusts & Trustees, p. 1114; and see *Connecticut Junior Republic Assn., Inc.* v. *Litchfield,* 119 Conn. 106, 110, 112, 174 Atl. 304. There is no legal requirement that charitable benefits must reach the intended beneficiaries free of cost. *Boardman* v. *Burlingame,* 123 Conn. 646, 654, 197 Atl. 761; *People* v. *Y.M.C.A. of Chicago,* 365 Ill. 118, 122, 6 N. E. (2d) 166; *McDonald* v. *Massachusetts General Hospital,* 120 Mass. 432, 435. The trust is likewise public, conferring, as it does, something beneficial to persons indiscriminately. *Hamden* v. *Rice,* 24 Conn. 350, 355. The essential feature of a trust for public charity is that it is not confined to privileged individuals but is available to a reasonably defined class of the indefinite public or some part thereof, and it is this unrestricted quality that accounts for its public character. *Doyle* v. *Whalen,* 87 Me. 414, 425, 32 Atl. 1022; *Kent* v. *Dunham,* 142 Mass. 216, 217, 7 N. E. 730; *In re Downer's Estate,* 101 Vt. 167, 172, 142 Atl. 78. The class of young men and women which Mr. Porter sought to benefit is designated with reasonable certainty. It is a large one, for he imposed no restrictions as to race, residence or otherwise, but in a trust of this character the number of possible beneficiaries is immaterial. *Woodruff* v. *Marsh,* 63 Conn. 125, 129, 26 Atl. 846. Nor is it of any moment that the power of selection was not expressly given. That power is implied as a necessary incident to the administration of the trust. *Shannon* v. *Eno,* 120 Conn. 77, 84, 179 Atl. 479.

In meeting an attack upon charitable trusts, it is essential for a court to remember that they are highly

favored and every reasonable intendment is to be made in order to sustain them and thus to effectuate the benevolent intent of the settlor. *Hartford National Bank & Trust Co.* v. *Oak Bluffs Baptist Church*, 116 Conn. 347, 352, 164 Atl. 910; *Coit* v. *Comstock*, 51 Conn. 352, 377. But it may happen, as in this case, that insufficient property is provided to accomplish the purpose for which the trust is created. Admitting the inability of the gift of the testator, even as now augmented, to carry out the ambitious plan he had designed, the appellants contend that the doctrine of approximation justifies the transfer of the fund to the proper authorities as a contribution towards the erection of the proposed trade school building. The doctrine, which is applicable solely to charitable trusts, has its limitations. It may be employed only where, upon the failure of the trust, the court finds in the terms of the will, read in the light of the surrounding circumstances, a general intent to devote the property to a charitable use to which the intent that it go to the particular purpose named is secondary. *Duncan* v. *Higgins*, 129 Conn. 136, 140, 26 Atl. (2d) 849.

A crucial question, then, is whether Mr. Porter had the necessary general intent to make the doctrine applicable. We are satisfied to the contrary. He was critical of the methods of instruction then in vogue and had conceived a novel scheme of education to supplant them. Disturbed, as he was, by policies he deemed ineffectual and inefficient, it is hardly reasonable to believe that he entertained a general intent to further a cause to which he was long opposed. Without detailing all the indicia of his mental processes, it is ample to observe that they demonstrate, through the wording of his will and in the light of surrounding circumstances, a deep-seated desire to dedicate his estate to an institution that would revolutionize, so

to speak, the method of advancing learning among the young. He was in all respects an educational icono-clast, yet willing to submit a constructive idea which he wished to have tried out. That it was this idea, and this alone, he desired to promote seems an in-escapable conclusion from the language of the will wherein he directed that the institution shall be opened "as soon as . . . a capable and reliable president or principal can be secured who will undertake the work under the conditions imposed." Nor is this ex-cerpt the only significant language shedding light on his intent. Elsewhere he provided that the "school or college on the portion of the land above designated [is] to be operated according to the following plan." And finally, as if to remove the matter from all doubt, he stated that "the provisions and conditions of the legacy are to be interpreted according to this general plan and purpose."

We have not left unnoted that the testator made charitable bequests to two churches, a circumstance worthy of consideration as imputing a general chari-table intent to Mr. Porter. *Hartford National Bank & Trust Co.* v. *Oak Bluffs Baptist Church,* supra, 354. But the restrictions he imposed, including that as to the site of the school upon his ancestral land, are couched in language too strong to be ignored. His will is, in effect, an order to carry out his educational pro-gram and none other. Because of the absence of a general charitable intent, the doctrine of approxima-tion is not applicable.

We are not to be understood as intending to narrow the scope of the doctrine, now thoroughly embedded in our law. On the contrary, we reaffirm it. But a court may assume to exercise the extraordinary au-thority it grants only when a general charitable intent is clearly manifest. *Seymour* v. *Attorney General,*

124 Conn. 490, 498, 200 Atl. 815; *Newton* v. *Healy,* 100 Conn. 5, 10, 122 Atl. 654. Such an intent is not clearly manifest in this case.

The appellants further contend, contrary to their position in seeking the benefit of the doctrine of approximation, that the trust has not failed and that the fund should be permitted to accumulate until it becomes ample to carry out the testator's wishes. Whenever the amount required for the particular purpose of a trust is insufficient and the testator directs, as here, an accumulation of the interest after the fund has vested within the rule against remoteness, without specifying any precise time within which the accumulation is to continue, the court will fix a limit that is reasonable in view of all the circumstances. *Woodruff* v. *Marsh,* supra, 137; *Colonial Trust Co.* v. *Waldron,* 112 Conn. 216, 222, 152 Atl. 69.

The trial court reached the conclusion, among others, that the trust estate now in the hands of the plaintiff, together with probable accumulations during a reasonable period of time in the future, will be inadequate to carry out the testator's purpose. We cannot say that this conclusion is one which the trial court could not reasonably have reached in view of the length of time that already has passed and the uncontested finding as to the slow growth of the fund in the future.

It follows that the testamentary trust fails and a resulting trust attaches to the fund in favor of the estate of the testator. *Giersch* v. *Grady,* 85 Conn. 685, 687, 84 Atl. 103; Restatement, 2 Trusts, § 411. For this reason, the heirs-at-law of the testator have an interest in the fund, and so to adjudicate was as far as the trial court should have gone, rather than to have determined, as it did, that the entire residual estate ought to be distributed among them. Such an adjudication goes beyond the issues submitted by the

pleadings. The judgment must accordingly be modified.

There is error only as to the form of the judgment. The matter is remanded with instructions to modify it in conformity with this opinion.

In this opinion the other judges concur.