**CHENG FU SHENG and Lin Fu Mei, Plaintiffs,**

v.

**William P. ROGERS, Attorney General of the United States, Defendant.**

**No. 2580-59.**

United States District Court
District of Columbia.

Oct. 6, 1959.

Jack Wasserman and David Carliner, Washington, D. C., for plaintiffs.

Oliver Gasch, U. S. Atty., and Ellen Lee Park, Asst. U. S. Atty., Washington, D. C., for defendant.

HOLTZOFF, District Judge.

The principal question presented for decision in this case is whether an alien who is deportable to China may be deported to Formosa. This is an action against the Attorney General for a declaratory judgment, which would adjudicate that the plaintiffs, who are natives and citizens of China and whose deportation has been ordered, may not be deported to Formosa. The matter comes before this Court on cross-motions for summary judgment. There are no material

282

issues of fact and only questions of law are involved.

The plaintiffs are natives and citizens of China, who entered the United States in 1952 to receive military training with the United States Air Force. They completed their studies but failed to depart from this country. Deportation proceedings were thereupon brought against them by the Immigration and Naturalization Service of the Department of Justice, and eventuated in warrants directing the deportation of the plaintiffs "pursuant to law". It has been stipulated that the Government intends to execute the warrants by deporting them to Formosa, in view of the fact that deportation to the mainland of China is impossible due to its occupation by the Communist regime. The plaintiffs thereupon instituted this action against the Attorney General for a declaratory judgment adjudicating that their deportation to Formosa would be contrary to law.

■ The places to which an alien may be deported are expressly and specifically defined by statute. The provisions now in effect are contained in the Act of June 27, 1952, and are found in Section 1253 of Title 8 of the U.S.Code Annotated. This enactment enumerates eight possibilities as places of deportation. Each possibility, however, is expressly stated to be a *country*. Among them is the country from which the alien last entered the United States; the country in which is located the foreign port at which he embarked for the United States; the country in which he was born; the country in which his place of birth is situated when deportation is ordered; any country in which he resided prior to entering the country from which he entered the United States; or the country which had sovereignty over his birthplace at the time of his birth. It should be emphasized, however, that in each instance the place to which deportation may be ordered is a *country* and not a particular location. In this respect the 1952 statute is radically different from the earlier law,

which permitted deportation to be had to a particular port, such as the foreign port at which the alien embarked for the United States. Thus, Section 20 of the Act of February 5, 1917,[1] expressly provided that the deportation of aliens "be to the country whence they came or to the *foreign port*[2] at which such aliens embarked for the United States;  *  *."' Were this provision in existence in the present statute, there would be no doubt whatever that the deportation of the plaintiffs to Formosa would be valid. For some reason which does not seem to appear in the legislative history, this provision was not included in the 1952 Act, and thereby was repealed by implication. No doubt the Congress must have had some good reason for abrogating the power of the Government to deport an alien to a specified port and requiring deportation only to a designated country.

Since the plaintiffs are natives and citizens of China, their deportation may properly be effected to China. The question then arises whether Formosa is part of China. If it is, they may lawfully be deported to Formosa.

■ It is fundamental that such questions as whether a foreign country or a foreign government should be formally recognized; whether a particular nation has sovereignty over a specified area; and what are the boundaries of a foreign country, are problems that are not to be solved by the courts, but are political matters that are to be decided by the executive and legislative departments of the Government. On such topics the President and the Secretary of State speak for the United States, and the courts are obligated to follow their pronouncements.

Thus, in the leading case of Jones v. United States, 137 U.S. 202, 212, 11 S.Ct. 80, 83, 34 L.Ed. 691, Mr. Justice Gray wrote as follows:

"Who is the sovereign, *de jure* or *de facto,* of a territory, is not a judicial, but a political, question, the determination of which by the legisla-

1. 39 Stat. 874, 890.

2. Italics supplied.

tive and executive departments of any government conclusively binds the judges, as well as all other officers, citizens, and subjects of that government. This principle has always been upheld by this court, and has been affirmed under a great variety of circumstances."

The following authorities among the legion that might be cited are to the same effect: Foster v. Neilson, 2 Pet. 253, 307, 309, 7 L.Ed. 415; Williams v. Suffolk Ins. Co., 13 Pet. 415, 420, 10 L.Ed. 226; Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726; National Union Fire Ins. Co. v. Republic of China, 4 Cir., 254 F.2d 177; Latvian State Cargo & Passenger SS Line v. Clark, D.C., 80 F.Supp. 683; Oppenheim, International Law, 7th Ed. Sec. 357a; I Hackworth, Digest of International Law, 165.

It is necessary, therefore, to ascertain and be guided by the attitude of the Department of State on the question whether Formosa is to be regarded as a part of China.

The attitude of the State Department is stated in a formal communication from Ely Maurer, Assistant Legal Adviser for Far Eastern Affairs of the Department of State, dated June 2, 1959, and addressed to Mr. Robert J. Asman, an Assistant United States Attorney. This statement was submitted by Government counsel as representing the views of the political department of the Government on this subjct. Pertinent portions of this statement read as follows:

"In response to your telephone inquiry of this date, you are informed that the United States recognizes the Government of the Republic of China as the legal Government of China. The provisional capital of the Republic of China has been at Taipei, Taiwan (Formosa), since December 1949.

"In 1895, under terms of the Treaty of Shimonoseki, China was compelled to cede Formosa to Japan. In the Cairo Conference, the United States, United Kingdom and China declared it was their 'purpose' that Manchuria, Formosa and the Pescadores 'shall be restored to the Republic of China.' Thereafter in August 1945 in the Potsdam Conference of the United States, United Kingdom and China declared 'that the terms of the Cairo Declaration shall be carried out.' This Potsdam Declaration was subsequently adhered to by the U.S.S.R. On September 2, 1945 the Japanese Government, in the instrument of surrender, accepted the provisions of the Declaration. The Supreme Allied Commander for the Allied Powers then issued Directive No. 1 under which the Japanese Imperial Headquarters issued General Order No. 1 requiring Japanese commanders in Formosa to surrender to Generalissimo Chiang Kai-shek of the Republic of China. Since September 1945 the United States and the other Allied Powers have accepted the exercise of Chinese authority over the island. In Article 2 of the Japanese Peace Treaty, which entered into force April 28, 1952, Japan renounced all 'right, title and claim' to Formosa."

A Department of State Bulletin, Vol. XXXIX, No. 1017, dated December 22, 1958, which constitutes an official expression of the foreign policy of the United States, contains the following discussion of the problem in which we are interested (pp. 1005 and 1009):

"Since the middle of the 17th century and up to 1895 Formosa was a part of the Chinese Empire. In 1895 under the Treaty of Shimonoseki China ceded Formosa to Japan. In the Cairo conference in November 1943 the United States, United Kingdom, and China declared it was their 'purpose' that Manchuria, Formosa, and the Pescadores 'shall be restored to the Republic of China'. Thereafter in August 1945 in the Potsdam conference the United States, United Kingdom, and China declared that 'the terms of the Cairo Declaration

# 284

shall be carried out.' This Potsdam declaration was subsequently adhered to by the U.S.S.R. On September 2, 1945, the Japanese Government, in the instrument of surrender, accepted the provisions of the declaration. The Supreme Allied Commander for the Allied Powers then issued Directive No. 1 under which the Japanese Imperial Headquarters issued General Order No. 1 requiring Japanese commanders in Formosa to surrender to Generalissimo Chiang Kai-shek of the Republic of China. Since September 1945 the United States and the other Allied Powers have accepted the exercise of Chinese authority over the island. In article 2 of the Japanese Peace Treaty, which entered into force April 28, 1952, Japan renounced all 'right, title and claim' to Formosa. *Neither this agreement nor any other agreement thereafter has purported to transfer the sovereignty of Formosa to China.* (Emphasis supplied.)

\* \* \* \* \* \*

"In giving the historical background of Formosa it has been pointed out that at Cairo the Allies stated it was their purpose to restore Formosa to Chinese sovereignty and at the end of the war the Republic of China received the surrender of Japanese forces in Formosa. It has also been pointed out that under the Japanese Peace Treaty Japan renounced all right, title, and claim to Formosa. However, *neither in that treaty nor in any other treaty has there been any definitive cession to China of Formosa. The situation is, then, one where the Allied Powers still have to come to some agreement or treaty with respect to the status of Formosa.*" (Emphasis supplied.)

■ From the foregoing official pronouncements of the Department of State, it appears that the United States recognizes the Government of the Republic of China as the legal government of China; that the provisional capital of the Republic of China has been at Taipei, Taiwan (Formosa) since December 1949; that the Government of the Republic of China exercises authority over the island; that the sovereignty of Formosa has not been transferred to China; and that Formosa is not a part of China as a country, at least not as yet, and not until and unless appropriate treaties are hereafter entered into. Formosa may be said to be a territory or an area occupied and administered by the Government of the Republic of China, but is not officially recognized as being a part of the Republic of China. Expressions of the State Department are drawn with care and circumspection to refrain from such recognition.

Whether such a territory may be regarded as a part of a country as that term is used in the Immigration laws, does not appear to have been decided. The existence of the question was noted by Mr. Justice Brandeis in United States ex rel. Mensevich v. Tod, 264 U.S. 134, 137, 44 S.Ct. 282, 68 L.Ed. 591, but expressly left open.

The conclusion seems inescapable to this Court that since under existing law, deportation may be effected only to a specific country, in this instance China, and since Formosa is not regarded by the Department of State as part of China as a country, the plaintiffs may not be deported to Formosa. Manifestly, as has been shown heretofore in this matter the Court must be bound by the official attitude of the Department of State, which apparently has been studied very carefully and expressed in guarded phraseology. It is even conceivable that for the Court then to regard Formosa as part of China for any purpose and thus go beyond the expressions of the Department of State, might cause embarrassment or complications insofar as that Department is concerned.

It is urged by Government counsel that the word "country" should be given a broad meaning. Manifestly, a statute should not be construed literally, but should receive a reasonable and sensible interpretation. On the other hand, the Courts should resist any temptation to

read into a statute something that is not there, or place a tortured construction on an enactment with a view to effectuating what the Court may think the Congress would have done had the matter been called to its attention. To do so would be an encroachment on the legislative power. It is peculiarly so in this instance because in the 1952 revision, the Congress dropped the provision contained in the 1917 Act, which permitted deportation to a specific foreign port. It would seem that to adopt the construction urged by the Government would in effect reinsert that phrase back in the statute—something that the Congress has not done so far and that the Court may not do.

The decision of the Fourth Circuit in Delany v. Moraitis, 136 F.2d 129, on which Government counsel, in part, rely, does not seem to help their position. That case held that a citizen of Greece, whose deportation had been ordered but who could not be deported to Greece because Greece had been overrun by Germany during the war, could be delivered into the custody of the Greek Government in exile in England. It must be observed that Judge Parker in his opinion based his decision very largely on war conditions then prevailing. The Congress later, in the 1952 revision, expressly limited the effect of the decision in the Delany case to deportation in time of war, 8 U.S.C.A. § 1253(b)(1). Consequently, the conclusion of the Delany case must be regarded as law only in time of war.

The Court is not unmindful of the fact that its conclusion leads to a temporary impasse and makes it impossible for the time being to effect the deportation of the plaintiffs, and possibly other citizens of China. This matter can, however, be easily solved, for the Congress can readily and promptly amend the statute and make the amendment retroactive, if it feels that deportation should be effected. This course need not involve undue delay. The Congress could possibly amend the statute by reinserting into it the above-mentioned provision from the 1917 Act, or by providing that deportation may be effected to any territory or area provisionally occupied by the Government of the country to which deportation must be effected, or in some other manner that would accomplish the same objective. Legislative action would be the orderly course. For the Court to construe the present Act as meaning something that it does not purport to mean, would be an invasion of legislative power.

Motion of defendant for summary judgment is denied.

Motion of plaintiffs for summary judgment is granted.