The rule is thus stated in 43 C.J.S. Injunctions, § 84, p. 566:

"Where an established business has been sold with its good will and there is a valid covenant not to compete, a breach is regarded as the controlling factor and injunctive relief follows almost as a matter of course. In such cases the damage is presumed to be irreparable, and the remedy at law is considered inadequate. It is not necessary that the buyer first prove special pecuniary damages or show an actual loss of customers who might in any event have discontinued their patron-

age. Injunctive relief may be given, even though only nominal damages are shown or although no actual damage is shown."

 We are of the opinion that under the undisputed facts in this case the petitioners were entitled to a temporary injunction as a matter of right and the trial court's failure to grant the temporary injunction was an abuse in law of the discretionary power vested in him.

The judgments of the trial court and the Court of Civil Appeals are therefore reversed and the cause remanded to the trial court with the instruction that the temporary injunction as prayed for be granted.

**SAN ANTONIO INDEPENDENT SCHOOL DISTRICT, Petitioner,**

**v.**

**DIVISION OF WORLD MISSIONS OF THE BOARD OF MISSIONS OF THE METHODIST CHURCH, Respondents.**

No. A–7572.

Supreme Court of Texas.

Nov. 30, 1960.

Rehearing Denied Jan. 25, 1961.

Clemens, Knight, Weiss & Spencer, San Antonio, W. St. John Garwood and William L. Garwood, Graves, Dougherty & Gee, Austin, for San Antonio Independent School District.

Luther M. Bickett, Boyle, Wheeler, Gresham, Davis & Gregory, San Antonio, for respondent Division of World Missions etc.

Cox, Patterson & Smith, San Antonio, for National Bank of Commerce, Trustee.

CALVERT, Justice.

This case involves the construction of certain clauses of the will executed by Theodore M. Plummer, deceased. Suit for declaratory judgment was filed by the National Bank of Commerce of San Antonio, as intervenor, naming as defendants the San Antonio Independent School District and the Division of World Missions of the Board of Missions of the Methodist Church. The defendants both claim the residuary estate under Plummer's will, the World Missions claiming under the primary residuary clause and the School District asserting claim as alternate beneficiary on the theory that the bequest to the World Missions has failed. The trial court, sitting without a jury, rendered judgment for the School District. The Court of Civil Appeals reversed and rendered judgment in favor of the World Missions. Division of World Missions v. National Bank of Commerce, 326 S.W.2d 934. The judgment of the Court of Civil Appeals is hereby affirmed.

Plummer executed the will involved in this suit on October 19, 1943. Codicils were later executed on February 14, 1945, and July 1, 1948. These codicils are not in litigation. Plummer died on January 29, 1949, and his will was probated in Bexar County, Texas. The residuary estate was devised to the National Bank of Commerce as Trustee, with directions to pay the net income to the testator's wife, Mrs. Mabel B. Plummer, during her lifetime. The Trustee carried out this provision until Mrs. Plummer's death on June 27, 1957.

Plummer's will provided for the following disposition of the residuary estate to be made after the death of Mrs. Plummer, the life beneficiary:

"VIII. * * * It is my will and desire that upon the death of my wife, Mabel B. Plummer, all the corpus or

assets in said Trust shall go to The Division of Foreign Missions of the Board of Missions and Church Extension of the Methodist Church, Incorporated by the State of New York, with present headquarters at 150 Fifth Avenue, New York City, New York, hereinafter called "Mission Board", for the purpose of physical and material relief only, such as food, clothing, medicine, shelter, etc., for needy Chinese people in China to be so used as rapidly as possible, consistent with good judgment and results, which I think will very likely be for the most part in the post war period, when China is accessible and there are no War Chests and there is less emotional sympathy for China."

*    *    *    *    *    *

"XII. I hereby authorize and empower the said Mission Board to deduct five (5%) per cent of all sums received by it from bequests herein, said five (5%) per cent to be deductible only once and not to be cumulative or repetitious, for its overhead, operation and distribution expenses or fee, to all of which it has agreed. It is my desire and I hereby direct that the remaining Ninety-five (95%) per cent shall reach the ultimate beneficiaries or consumers in the form of money, shelter, supplies or other material relief, free of all charges or deductions, except direct original costs and transportation, and that all relief received from this bequest shall be over and above any relief that would have been received by the ultimate beneficiaries without this relief, which is to say, that this bequest shall not be a substitue for other relief, and that my desires shall not be evaded or thwarted by using funds of this bequest where other funds would have been used, and shifting those other funds to other places or purposes. I approve religious work that the Mission Board may desire to do at its own expense and with other funds supplemental to this relief, and of incidental

benefits thereto which it may get, but the Mission Board shall be in honor bound not to lessen its other work with or benefits to the ultimate beneficiaries of this bequest, because of this bequest. I am not a Methodist and have in mind solely the beneficiaries herein named and am using this Mission Board for the purpose of efficient distribution. The Methodist Church has specialized in Chinese work and therefore should be well qualified for my purposes."

*    *    *    *    *    *

"XIV. * * * In the event the Mission Board shall refuse to accept or qualify for any bequest herein bequeathed to it, then and in that event the bequests herein made to it shall go to the School Board of San Antonio, (Texas) Independent School District, without restrictions, except that it shall be used for extra school work or activities, and not for the payment of debts or for buildings, nor for any expenses that the taxpayers should or customarily pay for."

*    *    *    *    *    *

"XVI. * * * As a group, social workers do not impress me as qualified to chart people's lives nor do I think their degree diplomas are certificates of near omnipotence as at least some appear to believe, by the way they scorn lay opinions. I therefore prefer to stick to the fundamentals or "grass roots" of material and physical relief and have chosen a field so broad and needy that doubtful cases need not be considered and I leave the social work to the many who prefer it. There is room for both views, especially as so many types of domestic relief and social work are now generally well supported by both the public and by governments, local, state and federal, with resulting controversies and complications into which I do not desire to deeply enter."

"I have selected China, with no prejudice, however, against other fields, as one of the world's largest fields for productive charity, where hundreds of millions of people of a backward but old and cultured race and civilization make a vast and fertile field susceptible to benign modernization and unlikely to make it malign as did the Japanese, whose people have endured slaughter and distress beyond comprehension, where resources are low and the people as a whole are kindly disposed and industrious, and have the capacity to appreciate and absorb the good in modern life if offered to them. I do not claim perfection for them or for any race or nationality."

The present controversy has arisen by virtue of the fact that, because of the existing international situation, the Mission Board cannot carry out the terms of the trust if it may provide food, clothing, medicine, etc., only to needy Chinese people in that part of historic China situated on the Asiatic mainland. Such activities there are proscribed by the governments of both the United States and the Chinese People's Republic. The Mission Board, however, avers that it is prepared to carry out the trust on the island of Formosa, where the government of Nationalist China will welcome such assistance, and in the British Crown Colony of Hong Kong.

The School Board has vigorously contested this position, and has presented three major questions to this Court for determination: (1) Can the provisions of the Plummer will relating to charitable operations in China be carried out by dispensing the funds on the island of Formosa or in the British Crown Colony of Hong Kong? (2) If not, does the Mission Board's signification of its willingness to take and administer the trust fulfill the requirement that the Mission Board "accept and qualify", so as to deprive the School Board of the right to take as alternate beneficiary? (3) Can the doctrine of cy pres be invoked to permit distribution of the charity in Formosa or Hong Kong, in view of the fact that an alternate beneficiary is named in the will?

■ ·Under the view we take of the case, it is unnecessary to pass upon the second and third questions, for we have concluded that the provisions of the will can be carried out by administering the charity to needy Chinese people of China who are refugees in Formosa and Hong Kong. We have reached that conclusion on the ground that it is our duty, as it must be our purpose, in the construction of the will to seek out and, if possible, to effectuate the intention of the testator. Hassell v. Frey, 131 Tex. 578, 117 S.W.2d 413; Burney v. Burney, 145 Tex. 311, 197 S.W. 2d 334; Republic National Bank of Dallas v. Fredericks, 155 Tex. 79, 283 S.W.2d 39.

Contrary to the assumption the School Board seems to indulge, the will does not require or provide that the Mission Board expend the funds derived from the estate *in China*, or even that the "food, clothing, medicine, shelter, etc." shall be furnished *in China*. All that the will requires is that the funds be used to provide "physical and material relief" to "needy Chinese people in China." Conceivably, the Mission Board could set up a station just outside the Hong Kong gateway to China and dispense food, clothing and medicine to all "needy Chinese people in China" who wished and were able to enter Hong Kong to receive them. That would be a compliance with the will in its strictest interpretation. But we do not believe that a reasonable or proper construction of the will places such a limitation on the Board in carrying out the purposes of the will.

Inasmuch as the will does not require that the testator's charity be dispensed in China, it seems obvious to us that the testator used the phrase "needy Chinese people *in* China" as meaning "needy Chinese people *of* China." The wording of his will discloses that the testator was thinking of the physical and material needs of a people who had "endured slaughter and distress beyond

comprehension." They were the people of a land of "hundreds of millions of people." He knew that his beneficence could aid only a very limited segment of the people whose needs were so great. It was for that reason that he stated that the field of need was so broad "that doubtful cases need not be considered."

Hundreds of thousands of Chinese people have fled from their homes within the boundaries of historic China on the Asiatic mainland and have become refugees. It is common knowledge that they are refugees from the type of slaughter and distress the testator described. Some two million of the refugees are now on Formosa. More than a million are in Hong Kong. These Chinese people are, within our general concept of domicile, still people *of China* who have left historic China only temporarily.

The reference in the will to China as a nation or a land is unimportant except as it designates the home of the people the testator wished to help. It was not his intention or purpose to aid in the agricultural, industrial or economic development of China. The obvious and logical reason for the testator to specify the "needy Chinese people *in China*" was to make certain that the funds were not used to benefit needy Chinese in such places as the Chinatowns of San Francisco and New York. All of these persons could be classified as "needy Chinese", and all might be deserving of charity, but they were not the people toward whom the testator felt a strong sympathy and desired to benefit by his will. By specifying "needy Chinese people in China", the testator made certain that the funds would go to Asia to the Chinese people whom he desired to help.

What reasons does the testator give for selecting the "Chinese people in China" for his charity? Are these reasons applicable to the Chinese refugees on Formosa and in Hong Kong, as well as to the people now in Communist China?

He wanted to benefit people who were in dire need of material aid, such as food, clothing, medicine and shelter; it is undisputed that the refugees in Formosa and Hong Kong are in need of such aid. He wanted to benefit a field "so broad and needy that doubtful cases need not be considered." The Chinese refugees in Formosa and Hong Kong, though not inhabiting as large an area as Communist China, need far more assistance than any one man could give by his charity. He wanted to benefit a group of people that he regarded as an "old and cultured race and civilization"; the Chinese refugees in Formosa and Hong Kong are all that remain in the free world of that race and that civilization. He wanted to benefit people who had "endured slaughter and distress beyond comprehension"; that is as true of the refugees in Formosa and Hong Kong as it is of the people in Communist China. Finally, although he was not himself a Methodist, he chose as his agent the Mission Board of the Methodist Church because it had "specialized in Chinese work"; this specialization and experience is as valuable in operations among Chinese refugees in Formosa and Hong Kong as it was in the older operational area of what is now Communist China. The people, the culture, and the problems are the same; only the immediate locale has changed.

It is our opinion that it was the intention of the testator to leave his charity to the Mission Board to be distributed among the needy Chinese people of China and it is well within its discretion to use the funds in providing for the physical and material needs of that segment of those people who are temporarily in Formosa and Hong Kong. Surely it would be a thwarting of the intention of the testator to permit his charity to this group of needy people to fail completely because of vicissitudes in the political scene, when they are still within reach of his charity and, perhaps, are in greater need than he could ever have envisioned.

The judgment of the Court of Civil Appeals is affirmed.

SMITH, NORVELL and HAMILTON, JJ., dissenting.

NORVELL, Justice (dissenting).

The charitable trust established by the last will and testament of Theodore M. Plummer is of a definite classification or type and hence subject to well established rules of construction. The trust may be classified as a "second taker" type wherein the settlor elects to provide for alternate beneficiaries himself in the event the provisions of the trust as to the primary beneficiaries cannot be carried out as contemplated by him, rather than have a court devise an alternative scheme of charitable distribution under the cy pres power. It is stated by Professor George G. Bogert, one of the advisors on Trusts to the American Law Institute, that:

> "Cy pres will not be applied where the settlor has made an express provision for an alternative disposition of his property, if the charity as he planned it proves impossible, inexpedient, or impractical. *He may prevent the need for application of cy pres by making a gift over in such case to a private donee or to another charity.*" (Italics mine) 2A Bogert, Trusts and Trustees, 318, § 431, The Cy pres power.

The primary beneficiaries under the charitable trust set up by Mr. Plummer were designated as "needy Chinese people in China." What the settlor meant by "China" is made abundantly clear by the will itself wherein Mr. Plummer explicitly stated that, "I have selected China * * * as one of the world's largest fields for productive charity, where *hundreds of millions* of a backward but old and cultured race and civilization make a vast and fertile field susceptible to benign modernization * *" Mr. Plummer undoubtedly meant to designate the Chinese people of the Asiatic mainland where hundreds of millions resided. This was the vast charitable field which he envisioned.

I am unable to agree with the Court's holding that charitable operations upon the Island of Formosa and in the British Crown Colony of Hong Kong constitute a literal or substantial compliance with the provisions of the trust.

The Court does not purport to reach its result by an application of the cy pres doctrine. Under cy pres (which in the absence of a second taker clause would probably be applicable to the present trust), the result reached by the Court might be supported. In re Swope's Estate, Surrogate's Court, New York County, 204 Misc. 510, 121 N.Y. S.2d 181. But to say that operations on Formosa and in Hong Kong constitute a literal or substantially literal compliance with the trust provisions *as written* by Mr. Plummer is another thing.

I am in agreement with the Court that there are three major questions presented, which I here repeat:

First, Can the provisions of the Plummer will relating to charitable operations in China be carried out by dispensing the funds on the Island of Formosa or the British Crown Colony of Hong Kong?

Second, If not, does the Mission Board's signification of its willingness to take and administer the trust fulfill the requirement that the Mission Board "accept and qualify" so as to deprive the School Board of the right to take as an alternative beneficiary?

Third, Can the doctrine of cy pres be invoked to permit distribution of the charity in Formosa or Hong Kong in view of the fact that an alternate beneficiary is named in the will?

Under my view of the case, it is necessary to consider all of these questions. Before considering them in detail, however, some additional statement may be helpful.

Mr. Plummer executed his last will and testament on October 19, 1943. Thereafter he executed two codicils; on February 14, 1945 and June 1, 1948, respectively. The residue of his estate valued at between $600,000 and $1,000,000 became the subject of a testamentary trust upon the death of

his wife, Mabel B. Plummer. Mr. Plummer died on January 29, 1949 and his wife died on June 27, 1957.

The will is unusual and remarkable in a number of respects. It sets forth a rather uncommon concept of charitable ministration and relief. No attempt was made to propagate any particular faith or religious doctrine and the establishment of a permanent or semi-permanent institution or foundation was not envisioned. Mr. Plummer evidently took cognizance of the immense sea of trials and sufferings which surround mankind and sought as best he could to alleviate this plight by applying his substance and wealth to "physical and material relief only." However, regardless of the philosophical rationale that may be advanced to account for the execution of the instrument, the directions and provisions of the will itself are clear and explicit. As heretofore stated, it is a particular type of will and is subject to definite rules and canons of construction. The will itself enjoins that the trust be carried out as written. The testator declared that he had "supplied 100% of the substance of this will and 95% of its phraseology" and that he had "noted with surprise and disapproval the tendency to set aside and alter wills or other written instruments because of oral testimony and alleged circumstantial evidence to the contrary", and pointedly directed "that regardless of any such testimony or evidence this Will shall not be set aside or altered, except by myself in writing, and in order to be effective such writing must be produced in court."

The opinion of the court sets out the pertinent portions of Sections VIII, XII, XIV and XVI of the will, while the opinion of the Court of Civil Appeals (326 S.W.2d 934) includes additional clauses which have some bearing upon the problem before us. These need not be repeated here.

At the time the will was executed in 1943, a state of war existed between the United States of America and the Japanese Empire. The Republic of China likewise was at war with Japan. This circumstance was recognized by the wording of the will itself. It was contemplated by most Americans and undoubtedly by Mr. Plummer that Japan would ultimately be defeated and all China freed of Japanese domination. Despite Communist activity in China at the time, it was hardly contemplated that this political philosophy and economic system would become dominant by force of arms and that China, then regarded by Americans as the oriental power most friendly to them, would be allied against the United States in the cold war which shortly followed the termination of the Japanese conflict. Viewed from this background and considering the wording of the will, it seems certain that when the will was executed, Mr. Pummer had in mind the Chinese of historic China situated upon the Asiatic mainland.

Mr. Plummer's two codicils made no material change affecting the charitable trust set up by the original will. As stated by the Court of Civil Appeals, these codicil changes concerned a small trust for his nephew and another for his cousin. No other changes were made. From anything Mr. Plummer wrote which was produced in court, it cannot be said that his testamentary intent ever changed. The beneficiaries of the trust still remained "needy Chinese in China."

The trust, however, did not become operative until the death of Mrs. Plummer. From the time of the making of the will in 1943, (or from the date of Mr. Plummer's death in 1949) to the date of Mrs. Plummer's demise in 1957, historical events of momentous importance took place in the Far East. Instead of the contemplated emergence of a China as a member of the free society of nations, the Communists gained complete hegemony on the mainland. The Nationalist government was forced from the continent and established its base on the Island of Formosa.

Reverting now to the first question posed in the court's opinion and heretofore set

out, I will consider respondents' contention that in the light of the historical developments mentioned, the provisions of Mr. Plummer's will may be literally carried out by administering charity on the Island of Formosa or in the British Crown Colony of Hong Kong. I would first point out, however, that the field of worthy charity is boundless in extent. It is a worthy charitable objective to relieve the sick and hungry. It is likewise a worthy charitable objective to promote the advancement of religion and the salvation of souls. Similarly, it is a worthy charitable objective to educate the young and thus contribute to the welfare of mankind. A need for charitable assistance exists in all these fields. Appeals for financial assistance in each and every one of them is a daily occurrence. It is, however, generally considered that the person contributing his substance to charity may determine the particular objective of his benevolence and that a court or other governmental agency should not perform that function for him. The burden of my protest is that in substance and effect, this Court has applied the doctrine of *cy pres* to a trust instrument prepared by a settlor who took special pains to make certain that the judicial power of *cy pres* should not be applied thereto.

Much of respondents' brief and this Court's opinion is devoted to the proposition that there is a need for charitable relief in connection with the refugee problem in Hong Kong and on Formosa. This asserted need for assistance, I do not deny. This argument despite its appealing and eloquent overtones is simply beside the point. From the terms of the written instrument itself (which Mr. Plummer enjoined us to follow in strong and unmistakable language) there is no indication that the settlor intended that the substance of the trust should be used in conducting furtive excursions within the boundaries of Red China for the purpose of administering charitable relief, or that such substance should be used for the establishment of refugee stations along the borders of Red China to administer relief to those fortunate enough to reach the refugee stations. Because of the nature of the refugee problem, relief stations of necessity operate under strict governmental control if not domination. Because of health problems, there must be quarantines and, because of the cold war, there must be espionage control. And, yet, we are enjoined against duplicating governmental services. The Asiatic mainland of 1957 presented an entirely different political structure to that envisioned by Mr. Plummer in 1943 when he prepared his will establishing a charitable trust naming as its primary beneficiary the "needy Chinese in China."

It will not do to say that, considering the testator's regard for the Chinese people, if Mr. Plummer were alive today he probably would approve of the proposed expenditures on Formosa and in Hong Kong. This form of reasoning involves speculation which is wholly unsupported by the written word. By such processes all certainty in written testamentary declarations could be destroyed. We should not attempt to direct the channel of Mr. Plummer's charity in accordance with what we might suppose his desire would be, had he been alive in 1957 when the trust became effective, and fully cognizant of the then existing international situation. On the contrary, we should respect the written provision of the will and it is submitted that the type of charity suggested by respondents is not that envisioned by Mr. Plummer, nor was it a type with which the Mission Board was familiar. At the time Mr. Plummer executed his will, the Mission Board had had no experience in handling quasi-governmental refugee problems incident to the cold war and because of existing relations between the governments of the United States and Communist China, there is no hope or assurance that the Mission Board could administer the trust in a form familiar to it upon the Asiatic mainland within the foreseeable future. Neither government will permit such operations and

the Mission Board has not been active on the Asiatic continent since 1949.

There is considerable discussion in the briefs with reference to the American position in regard to the relationship between mainland China and the Island of Formosa. The Island occupies an interesting situation in international law and its definite legal status is a matter for future settlement and determination among the nations of the world.[1] However, insofar as the will of not engulf the islands lying off the Chinese mainland. In 1949, numerous Americans failed to anticipate the rout of the armies of Chiang Kai-shek and were astounded with the rapidity of the Communist advance. Today, the causes of the deterioration of the Nationalist position on the mainland are mooted matters and the subject of much diversity of opinion. Here, we must await the future verdict of history.

The report of the opinion of Judge Holtzoff in Cheng Fu Sheng v. Rogers, D.C.D.C., 177 F.Supp. 281 contains copies of certain State Department bulletins. From them it appears that the United States recognizes the Government of the Republic of China (Chiang Kai-shek) as the legal government of China and that the provisional capital of the Republic of China has been at Taipei, Tiawan (Formosa) since December, 1949; that in both the Cairo and Potsdam conferences, the United States agreed that Formosa should be restored to China; that the United States and its allies required the Japanese to surrender Formosa to Generalissimo Chiang Kai-shek, and since that time have recognized the Nationalist government of Chiang Kai-shek as having authority over the island. However, the Japanese peace treaty did not cede sovereignty over Formosa to China, but simply renounced "all right, title and claim" to Formosa.

In speaking of this "quitclaim" the State Department said:

"Neither this agreement nor any other agreement to sovereignty has purported to transfer the sovereignty of Formosa to China * * *"

"[N]either in that treaty [Japanese Peace Treaty] nor in any other treaty has there been any definitive cession to China of Formosa. The situation is, then, one where the Allied Powers still have to come to some agreement or treaty with respect to the status of Formosa."

The case of Cheng Fu Sheng involved the construction of an Act of Congress regulating the deportation of aliens. The meaning of the word "country" as used in several parts of the Act was of importance. The District Court held

1. From State Department bulletins and articles appearing in periodicals and surveys prepared for institutes and foundations (all cited in the briefs) it appears that the American position as to the status of the Island of Formosa is purposely ambiguous and awaits further historical developments.

"The island's history may be divided roughly into the following periods: 1590, Western discovery by the Portuguese; 1624–1661, Dutch colonial rule; 1622–1683, the Koxinga kingdom; 1684–1874, a 'protectorate' of the Manchu dynasty; 1875–1894, a province of the Manchu dynasty; 1895, Formosa Democratic Republic; 1896–1945, Japanese colonial rule; 1945 to the present, Chinese Nationalist rule." The Chinese Impasse by Li Thian-hok, 36 Foreign Affairs magazine 437. In the cited article it is also said that, "Of the island's 10,000,000 people, less than one fifth come from the mainland * * *"

There is no question of Japanese sovereignty over Formosa from 1896 until the end of World War II. In 1943, when Mr. Plummer's will was executed, Formosa was a part of the Japanese empire. Declarations of the Allied Powers against Germany and Japan that Formosa should be restored to China had not then been rendered effective by military power.

The progress of the Communist conquest of mainland China is also discussed in the briefs. The Nationalist forces under Chiang Kai-shek occupied Formosa in September, 1945, but the government was not moved to the island until December, 1949. In the latter part of 1948, control of Manchuria passed from the Nationalist government to the Communists who then surged from the north through central and southern China during 1949. Nanking fell in April of 1949, Shanghai in May and Canton in October. By the end of the year the Nationalists had quitted the continent and the mainland was lost to the Communists. Mr. Plummer executed his last codicil on June 1, 1948 and died on January 29, 1949. He left nothing in writing that indicated that he foresaw the Communist sweep, or, if he did, that he anticipated that the encroachment would

Mr. Plummer is concerned the words and clauses used by him establish his intention that the proceeds of the testamentary trust should be used for the benefit of Chinese upon the Asiatic mainland and not Chinese on the Island of Formosa or elsewhere in the world outside the boundaries of historic China. What has been said with reference to Formosa applies also to the British Crown Colony of Hong Kong which consists of Hong Kong Island (32 square miles) ceded by China to Britain in 1841, Kowloon peninsula (3 square miles) and a small adjoining mainland area, known as the "New Territories" held under a ninety-nine year lease negotiated in 1898. The total area of the colony is 391 square miles and its population approximately 1,750,000. Like Formosa, its population has been swelled by refugees from the mainland. Neither Hong Kong nor Formosa, however, is the "China" contemplated by Mr. Plummer in his will. In view of the directions for a rapid and expeditious use of the assets of the charitable trust for the relief of "needy Chinese in China," it appears that the terms of the will cannot be strictly or substantially carried out and its directives performed. The first question therefore should be answered in the negative.

In addition to the holding that the Mission Board is in a position to comply with and carry out the testamentary trust as

written (with which conclusion, I disagree), the Court of Civil Appeals [326 S.W.2d 935], concluded that because the Mission Board had not refused to "accept and qualify" as trustee for the purpose of carrying out the purposes of the trust, the second or substitute taker, the San Antonio Independent School District, has no valid claim to the trust assets. This brings us to a consideration of the second question set forth in the Court's opinion.

In this particular case, the "accept and qualify" issue is largely academic in nature. There can be no question of the Mission Board's lack of right and interest in the trust property if it be impossible to carry out the trust. The issue then is restricted to an inquiry into the School District's interest as a second taker. If a designated person or entity accepts an appointment as trustee under a charitable trust in the sense of signifying willingness to undertake the duties designated by the trust instrument, but it appears that at the time, or thereafter, the trust cannot be carried out, the trust necessarily must fail. If the trust instrument names a secondary taker, the question might arise, and, as reflected by the reported cases, has arisen as to whether the second taker or the settlor's heirs at law are entitled to the benefits or assets of the trust. Regardless of which answer is given to this question, the trust property

that Chinese nationals could not be deported to Formosa. The Court of Appeals reversed but did not hold that Formosa was a part of China. It held that Formosa itself was a "country" within the meaning of the Congressional Act. It was said that, "Since Formosa is a well-defined geographical, social and political entity and since there is a government on Formosa which has undisputed control of the island, we think it is a 'country' within the meaning and purposes of the statute." See, Rogers v. Cheng Fu Sheng and Lin Fu Mei, D.C. Cir., 280 F.2d 663.

Whether the United States without equivocation ever recognizes Formosa as a part of China depends upon a number of factors, such as whether or not the mainland continues to be Communist controlled, whether, if Communist control

continues, there occurs a change in its foreign policy toward the west and a resultant change in the attitude of the United States. At the present writing, mainland China is under the actual control of one government and the Island of Formosa is under the control of a different government. The declared policy of the United States is that the present Communist government of mainland China shall not control the Island of Formosa.

A consideration of the historical events which have occurred during 1948, and since that time, while of interest, throw but little light upon the testamentary intentions of Mr. Plummer. He died in January of 1949, and he left nothing in writing from which his views of the 1948 far eastern situation can be gleaned.

cannot be held by the trustee as a free asset, because a trustee is entitled to hold property only so long as he is able to carry out the purposes of the trust. Garner v. Home Bank & Trust Co., 171 Tenn. 652, 107 S.W. 2d 223; Ringo v. Ringo, Ky., 299 S.W.2d 112; First Universalist Society of Bath v. Swett, 148 Me. 142, 90 A.2d 812. The position of the second taker in situations like that of the School District here seems settled by the authorities. Where the condition stated for the attaching of the second taker's interest is the refusal of the designated trustee to accept (or some similar provision), a failure of the trust brings in the second taker and not the heirs at law.

In City of Belfast v. Goodwill Farm, 150 Me. 17, 103 A.2d 517, 518, the testator left property having a value of $28,721.65 to the City of Belfast, Maine, for the maintenance of the "Bagley Home for Aged Men" with a provision that, "In the event, however, the City of Belfast, Maine, refuses to accept this legacy and devise, I give, bequeath and devise the same to the Girls Home and Belfast Home for Aged Women, both located in Belfast, Maine, and the Goodwill Farm located in Fairfield, Maine, to share and share alike."

The City Council voted to accept the trust, but later when it appeared that the sum of money devised for the purpose of establishing a home for aged men was wholly insufficient, the City sought directions from the Court as to the disposition of the trust assets and asked that it be relieved of all obligations under the trust.

The Court held that the city had accepted the trust but that there was a failure of the gift for the purpose stated in the will. Although the will in the clause mentioning the second takers referred to a refusal to accept the legacy and devise, the Court held that a failure of the gift for the purposes stated in the will brought in the second takers. The claims of the heirs at law were denied and the property awarded to the substitute beneficiaries.

A similar case is that of Defenders of Furbearers v. First National Bank & Trust Co. of Lexington, Ky., 306 S.W.2d 100, 101. The testatrix directed that the remaining money belonging to her estate should be used by the Lexington and Fayette County Humane Society for the hire of "a competent agent to work on streets of Lexington and try to relieve the condition of miserable horses allowed to [be] overworked and mistreated."

The will contained the further provision that, "Should the above organization (the Humane Society) decline the request under my conditions, the money is to be divided equally between the National S. P. C. A. and Defenders of Furbearers—Washington, D. C."

The Humane Society claimed the bequest but the purpose of the gift failed in that in 1955 when the testatrix died there were no "miserable horses * * * overworked and mistreated," on the streets of Lexington. The Kentucky Court of Appeals held that the gift over to the Defenders of Furbearers and the National S. P. C. A. should be given effect. The Court said:

"As concerns the question of whether 'decline' includes an impossibility of performance, it seems reasonably clear from the language as a whole that the testatrix intended the gift over to take effect if her initial bequest was not in fact carried out, and she used the word 'decline' merely because a declination was the only reason that occurred to her at the time why the bequest might not be carried out. It is difficult to conceive of any reason why the Humane Society would decline the bequest unless it found compliance with the prescribed conditions would be so impractical or inexpedient as to be substantially impossible. Actually, it might be considered that the Society did in fact 'decline the request under my conditions,' because the Society is in the position of saying it would like to use the money but not for the restricted purpose expressed in the will.

"In City of Belfast v. Goodwill Farm, 150 Me. 17, 103 A.2d 517, there was an initial bequest to a city for a charitable purpose with a gift over should the city 'refuse to accept' the gift. The city did accept the gift but shortly found that the purpose of the charity had failed. The Maine court held that the gift over took effect, being of the opinion that the words 're-fuse to accept' included a failure of purpose."

These holdings are sound and well considered. The failure "to accept and qualify" must necessarily include a failure of the purpose of the gift.

The second question should likewise be answered in the negative. Camden Trust Co. v. Christ's Home, 28 N.J.Super. 466, 101 A.2d 84; First Universalist Church of Bath v. Swett, 148 Me. 142, 90 A.2d 812.

There remains for consideration the third question, namely, whether the *cy pres* doctrine may be applied to the trust as suggested by the respondent.

The American jurisdictions do not recognize the English doctrine of prerogative *cy pres.*[2] While some courts seemingly recognize no difference between the doctrine of judicial *cy pres* and deviation, the Restatement notices the distinction as shown by its definition of the *cy pres* power and the comment thereunder, viz.:

§ 399. "If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general inten-

tion to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor.

Comment a. "The doctrine of cy pres. The principle stated in this Section is called the doctrine of cy pres. The expression indicates the idea that where the exact intention of the settlor is not carried out, his intention is carried out 'as nearly as' may be. The doctrine is not applicable to private trusts, although there is an analogous but not as extensive a principle, which is applicable to private trusts (see § 167) as well as to charitable trusts (see § 381), permitting a deviation from the terms of the trust in matters relating to the administration of the trust where compliance is impossible or illegal or where owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust. * * *" § 399 and comment thereunder relating to Charitable Trusts, American Law Institute's Restatement of the Law of Trusts, Vol. 2, p. 297.

The change in operations from the Asiatic mainland where hundreds of millions of Chinese reside to the Island of Formosa where a few million are located constitutes more than a mere deviation in the administration of the charitable trust here involved and if supportable, must find some basis in judicial *cy pres.*[3]

2. In speaking of the prerogative *cy pres*, it is said in American Jurisprudence that, "The principal, if not the only, cases in which the disposition of a charity is held to be in the crown by sign manual are of two classes: the first, of bequests to particular uses charitable in their nature, but illegal, as for a form of religion not tolerated by law; and the second, of gifts of property to charity generally, without any trust interposed, in which either no appointment

is provided for or the power of appointment is delegated to persons who die without exercising it." 10 Am.Jur. 675. See also, Comment e under § 399 of the American Law Institute's Restatement of the Law of Trusts, Vol. 2, p. 300, Judicial and prerogative *cy pres;* Paschal v. Acklin, 27 Tex. 173, 174, loc. cit. 200.

3. For an example of an exercise of the cy pres power involving the existing

According to the Restatement a general charitable intention may be given effect so as to prevent a failure of the trust even though there is a failure of the stated specific purpose. It would follow that where the settlor provides that if a specific purpose cannot be realized, the assets of the trust should be applied to another definitely stated purpose, there can be no room for the application of the *cy pres* doctrine.

Professor Austin W. Scott, the Reporter on Trusts for the American Law Institute, states that:

"If the testator makes an express provision as to the disposition of the property in case the particular purpose fails, that provision is controlling. Thus if he provides that if the particular purpose should fail the property should be devoted to certain other charitable purposes, it will be so applied. It is immaterial that the gift over to the other charity may happen beyond the period of the rule against perpetuities, since that rule is not applicable to a gift over from one charity to another. So also, the doctrine of cy pres is inapplicable where there is a valid gift over to an individual if the gift for charity should fail." 4 Scott on Trusts (2d ed.) 2832, § 399.2. The exercise of the cy press power.

In the case of Fletcher's Estate, 280 N.Y. 86, 19 N.E.2d 794, 795, the New York Court of Appeals said:

"The testator, by paragraph 'fourteen,' made clear beyond any conceivable doubt that, if the bequest under paragraph 'fifth' should for any reason be declared inoperative, the amount therein mentioned should go to appellant Chadwick. He was an attorney, and this provision of his will renders certain that he did not wish the cy pres doctrine to interfere with his determined purpose. The parties stipulate facts which render the bequest inoperative and the opinion and finding in the courts below so declare. Therefore, in view of the testator's command in paragraph 'fourteenth,' the doctrine of cy pres cannot attach."

Chinese situation and a charitable trust, see, In re Swope's Estate, Surrogate's Court, New York County, 204 Misc. 510, 121 N.Y.S.2d 181, in which the Board of Foreign Missions of the Methodist Episcopal Church was permitted to pay over to the Nanking Theological Seminary, a New York educational corporation, certain funds which were bequeathed for the maintenance of the Nanking Theological Seminary at Nanking, China, because Communist control of Nanking made it impossible to carry out the exact directions of the will.

The Mission Board relies upon the case of Loring's Estate, 29 Cal.2d 423, 175 P.2d 524, 531, wherein the doctrine of cy pres was not applicable because there was no general charitable intent expressed in Loring's Will. The bequest was to the Town of Kingsley, Iowa for the construction of a hospital. The amount of money so allocated was $75,000. Because of a shrinkage in the assets of the estate, a much smaller sum was actually available for this purpose at the time of distribution. The Supreme Court of California held that the bequest did not fail, but that the money available should go to the Town for the construction of a smaller hospital, saying, "It does not follow, however, that the *particular purpose* of the testator cannot be carried out because there are less funds available than he had contemplated." The Court relied upon the doctrine of deviation which is applicable to both private and charitable trusts as above pointed out. In Loring there was no substitution of beneficiaries. In connection with the Loring case, compare, In re Fletcher's Estate, 280 N.Y. 86, 19 N.E.2d 794 and Ringo v. Ringo, Ky., 299 S.W.2d 112.

Many jurisdictions make no distinction between cy pres and deviation or approximation. Crawfordsville Trust Co. v. Elston Bank, 216 Ind. 596, 25 N.E. 2d 626; Waterbury Trust Co. v. Porter, 131 Conn. 206, 38 A.2d 598, 14 C.J.S. 512 Charities § 52; 11 Am.Jur. 675, Charities § 123. Others hold that where the trust instrument contains a gift over, expressed or implied, neither the doctrine of deviation nor of cy pres is operative. Findley v. City of Conneant, 145 Ohio St. 480, 62 N.E.2d 318; Mississippi Children's Home Society v. City of Jackson, 230 Miss. 546, 93 So.2d 483.

In City of Belfast v. Goodwill Farm, 150 Me. 17, 103 A.2d 517, 520, heretofore mentioned, it was said that:

"There is a further and compelling reason why equity will not invoke the rule of 'approximation' in this instance. Cy pres is not applicable where there is a specific alternative gift effective on failure of the primary charitable gift. This principle, in our view, operates here to the advantage of the institutions."

In Defenders of Furbearers v. First National Bank & Trust Company of Lexington, Ky., 306 S.W.2d 100, 102, it was said:

"It appears to be the general rule that cy pres will not be applied where there is an express provision in the instrument of gift for an alternative disposition of the property if the designated charity proves impossible, inexpedient or impractical. Bogert, Trusts and Trustees, sec. 341, p. 318."

See also, In re Harrington's Estate, 151 Neb. 81, 36 N.W.2d 577; First National Bank of Chicago v. American Board of Commissioners for Foreign Missions, 328 Ill.App. 481, 66 N.E.2d 446; Camden Trust Co. v. Christ's Home, 28 N.J.Super. 466, 101 A.2d 84.

In view of the provision in the will for a substitute taker and an alternative disposition of the trust assets, it follows that the doctrine of *cy pres* has no application to the provisions of the testamentary trust under consideration. The third question should also be answered in the negative.

For the reasons stated I would reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court. Accordingly, I respectfully dissent from this Court's order affirming the judgment of the Court of Civil Appeals.

SMITH and HAMILTON, JJ., join in this dissent.