THE MINISTERS AND MISSIONARIES BENEFIT BOARD OF THE AMERICAN BAPTIST CONVENTION ET AL. *v*. THE MERIDEN TRUST AND SAFE DEPOSIT COMPANY, TRUSTEE (WILL OF LELAND H. IVES), ET AL.

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, Js.

Argued November 6, 1952—decided February 3, 1953

*Arthur W. Chambers,* with whom were *Gordon P. Chambers* and, on the brief, *George C. Conway,* attorney general, and *William L. Beers,* deputy attorney general, for the plaintiffs.

*Denis T. O'Brien, Jr.,* with whom were *Robert M. Luby* and, on the brief, *William M. Luby* and *Denis T. O'Brien, 3d,* for the defendants.

O'SULLIVAN, J. This matter came to the Superior Court as an appeal from probate, taken jointly by the Ministers and Missionaries Benefit Board and the attorney general of the state of Connecticut. The order from which the appeal was taken was entered by the Probate Court for the district of Meriden. The challenged part of the order provided that one-half of the residue of the estate of Leland H. Ives, deceased, be distributed to his wife's estate. With the consent of the parties and upon their stipulation of agreed facts, the Superior Court reserved for our advice the eight questions recited in the footnote.[1] The defendants are the named bank, as executor and

---

[1] "1. Did the gift of one-half of the rest, residue and remainder in [Article] Third (g) of the will to The Baptist Ministers Home Society of Mt. Vernon, New York, lapse because of beneficiary's dissolution before testator's death?

"2. Is such one-half interest now intestate property and distri-

trustee under the will of the testator and in similar capacities under the will of his wife, and the residuary beneficiaries under the latter will.

The facts are these: Leland H. Ives, the testator, was born in Meriden in 1859. He and his parents, John and Wealthy S. Ives, were lifelong, active members of the First Baptist Church Society of Meriden. His mother died in 1914 and his father in 1915. The testator lived opposite the church until the last few years of his life. He always contributed to it and concerned himself with its affairs, although in his later years his interest became less active. He was a member of its board of trustees for eighteen years and at one time served as chairman. This board had charge of all collections, disbursements and other financial operations of the church. He was a close friend of the Reverend Burtt Timbie, its pastor from 1912 to 1947.

Late in life, Ives married Mrs. Florence W. Fisk. There were no children born of the marriage. He died testate on January 31, 1943, in his eighty-fourth year, leaving his wife as his only heir at law and next

butable to the legal representatives of Florence W. Ives, who was testator's wife and his sole heir at law and next of kin?

"3. Do the provisions of said [Article] Third (g) create a permanent charitable trust and a gift for a charitable use?

"4. Did the testator by the provisions of said [Article] Third (g) intend that the income from said one-half interest should be used for the general charitable purposes of aiding aged, infirm and destitute Baptist Ministers and Missionaries, their widows and orphans, residing in the States of Connecticut, New York and New Jersey?

"5. Is such one-half interest distributable to Ministers and Missionaries Benefit Board, in trust, as successor to said Home Society?

"6. Is such one-half interest distributable in trust to Ministers and Missionaries Board under *cy pres*, or the doctrine of approximation?

"7. May the trust provisions of [Article] Third (g) be carried out by the naming of a successor trustee?

"8. To whom should such one-half interest be distributed?"

of kin. His will had been executed on December 8, 1937. Under its terms he left the residue of his estate to the defendant bank, in trust, to pay the net income and, in its discretion, part of the principal to his wife and his sister during their lives and then to the survivor until her death. Mrs. Ives died on November 16, 1950, and his sister on July 19, 1951. By the provisions of article third the trustee was directed, upon the death of the last life tenant, to pay several legacies from the fund and thereafter (paragraph f) to hold one-half of the balance in permanent trust and turn over the net income to the First Baptist Church Society of Meriden. Article third (g) then directed the trustee "To pay the remaining one half of all balance of principal to the Baptist Ministers' Home Society of Mt. Vernon, New York, said Society to hold the same in permanent trust, the income thereof only to be used by said Society for its general purposes and said trust fund to be known as and called 'The John and Wealthy S. Ives Fund.'"

The Baptist Ministers' Home Society, hereinafter called the home society, was incorporated on December 20, 1882, under the general statutes of New York permitting the incorporation of benevolent, charitable and missionary societies. The objects or general purposes of the corporation were "to provide the aged, infirm and destitute Baptist Ministers and Missionaries, their widows and orphans, residing in the States of Connecticut, New York and New Jersey, with a comfortable residence, board, clothing, and medical attendance, and at their death, if dying within the Home, with respectable burial and for these purposes to establish and maintain a Home, which shall be known as the Baptist Ministers' Home of New York, and which shall be located in or

near the City of New York, in the State of New York, and further to receive and distribute such sums of money or property, as may by the donors be designated for that purpose to the persons heretofore named, according to their necessities, instead of maintaining them at the Home." In addition to disbursing money as grants, the home society at one time maintained its headquarters at Mt. Vernon, New York, in a house where its executive secretary and his family lived and where, until 1911, a few needy clergymen occasionally resided. The house was sold in 1919 and thereafter no shelter for anyone was maintained. The corporate existence of the home society was terminated on June 10, 1941, by the filing of a certificate of dissolution with the New York department of state.

Until the formation in 1908 of a voluntary organization then called the Northern, but now the American, Baptist Convention, co-operative projects of northern Baptists, from Maine to California, were conducted through many independent and unrelated societies. The convention is an advisory assembly of representatives from member churches throughout the northern part of the United States and it functions through the instrumentality of several corporations. The First Baptist Church of Meriden has always participated actively in convention affairs and has sent delegates to convention meetings whenever they were held within reasonable distances.

Since the relief of needy Baptist ministers, missionaries and their families had been largely neglected, except in a few local areas, the convention caused the named plaintiff to be incorporated in 1913 under the laws of the state of New York. The stated objects of this corporation, hereinafter to be called the benefit board, included the following: ". . . to

administer its funds for the benefit of worthy Baptist ministers and Baptist missionaries, their wives, or widows, and their dependent children, either directly or through the medium of related organizations; to cooperate with such organizations in securing, so far as practicable, uniformity in the methods for the extension of such aid. . . ." The general plan of the convention was that eventually each of the varied activities relating to the support of ministers would be carried on exclusively by the benefit board, that all Baptists and Baptist churches could thus bring each separate service into a single, cohesive and united effort with a minimum of expense and a maximum of effectiveness, and that many small, separate and unrelated units could be discontinued and their several independent functions merged into and expanded by the single larger corporation.

The benefit board immediately organized on a convention-wide scale the relief work previously carried out locally by the home society and ten comparable societies, and raised considerable funds to perpetuate the work. From its endowment income and current contributions by churches and individuals, the benefit board has annually distributed substantial and constantly increasing amounts to needy Baptist clergymen. From 1913 to 1916 both the home society and the benefit board solicited funds within Connecticut, New York and New Jersey, with duplication of expense and effort. During this period there were frequent discussions concerning possible union of the two organizations, and these led to an agreement executed by them in 1916. Thereafter, this agreement formed the basis for their respective activities. The preamble recites that the benefit board was providing aid throughout the convention area and that the home society was doing the same work but in the

limited area of the three states; that both parties had been soliciting funds within those states and that it was desirable that overlapping, duplication of appeals and resulting confusion be avoided. It was agreed that after December 31, 1916, only the benefit board would solicit support for the work, that it would assume and continue payment of all benefits then being paid by the home society, that it would take over the work theretofore done by the home society in the three states and maintain it at a standard not less than the current level, and that all new applications for aid should thereafter be made only to and be granted by the benefit board. This was done.

For a number of years after 1916, the home society retained its capital funds and all legacies received by it, but paid to the benefit board all income in excess of that required to meet the expense of maintaining its corporate existence. In 1924, the home society was authorized, by a special act of the New York legislature, to turn over to the benefit board any funds or assets which it then owned or might thereafter acquire, and in September of that year it transferred to the benefit board funds and securities in excess of $90,000. For a period thereafter, the home society retained capital funds of about $10,000, using the income for its running expenses, but all legacies which it received were regularly turned over to the benefit board.

On June 10, 1941, the home society, pursuant to its own vote, filed a certificate of dissolution of its corporate existence with the department of state of New York. For the dissolution to become effective and for its assets to be transferred to the benefit board, it was necessary to obtain the consent of the New York charities and welfare board. On the peti-

tion of the home society for permission to transfer its remaining funds to the benefit board, the Supreme Court of the state of New York entered an order authorizing the home society to "transfer the balance of the funds and securities of the Baptist Ministers Home Society of New York to The Ministers and Missionaries Benefit Board of the [American] Baptist Convention, a New York corporation formed for like purposes which is administering and carrying out the purposes and work for which The Baptist Ministers Home Society was formed and created." The benefit board is the only organization within the convention area which solicits funds and distributes aid to needy Baptist clergymen and their dependents. In the year ending April 30, 1951, the amount which it paid to such beneficiaries within the states of Connecticut, New York and New Jersey was $26,670.03. The number of eligible beneficiaries within these states is substantially increasing every year. The benefit board is organized, equipped, prepared, willing and legally empowered to receive the fund in question, to hold it in the designated name and to administer it as a separate, permanent trust, disbursing the entire income thereof solely for beneficiaries within the three states mentioned and in the identical manner in which the home society would have disbursed it.

On an application for the ascertainment of distributees of the estate of the testator, Leland H. Ives, the Meriden Probate Court entered its order that the bequest to the home society had lapsed, that the one-half part of the trust principal is intestate estate, and that it be paid over to the estate of Florence W. Ives, deceased.

In spite of the length of the foregoing recital, the reservation submits a relatively narrow issue. The

defendants concede that the testator's purpose in making the gift was to create a charitable trust. We are not in accord, however, with their position that the home society was both trustee and beneficiary. The beneficiaries, identified by legitimate resort to the home society's charter, are "the aged, infirm and destitute Baptist Ministers and Missionaries, their widows and orphans, residing in the States of Connecticut, New York and New Jersey." One of the objects of the trust was to house these individuals in a home operated by the home society. When the existence of this corporate trustee was terminated, that specific method of caring for the beneficiaries could no longer be carried out. Literal compliance with all of the terms of the trust was rendered impossible. The gift, therefore, must be held to have lapsed unless it can be saved by applying the doctrine of approximation.

The doctrine may be employed only when the testator's will, read in the light of surrounding circumstances, evidences a general intent to devote the gift to a charitable use, to which the intent that it go to the particular organization named is secondary. *Duncan* v. *Higgins,* 129 Conn. 136, 140, 26 A.2d 849. The language of a will is controlling. *Travelers Bank & Trust Co.* v. *Birge,* 136 Conn. 21, 26, 68 A.2d 138. This requires the court, at times, to resort to extrinsic facts as an aid in explaining any language whose meaning the testator has left uncertain. *Hoenig* v. *Lubetkin,* 137 Conn. 516, 519, 79 A.2d 278. In the case at bar, the controversy centers around article third (g), a part of which is expressed with insufficient clarity to remove doubt as to what it was intended to accomplish. In that article, the testator made the following provisions: (1) He named the home society as legatee of one-half of an existing

fund, originally created for the benefit of his wife and his sister; (2) he impressed the bequest with a permanent trust; (3) he directed that it be called "The John and Wealthy S. Ives Fund"; (4) he limited expenditures to income alone; and (5) he ordered that the use be for the "general purposes" of the home society.

There can be no doubt as to the meaning of the first four provisions mentioned. Whatever uncertainty exists is found in provision (5). For this reason, the articles of incorporation of the home society may be consulted to clarify and explain the testator's use of the words "general purposes." This does not violate our principle of law that a memorandum may not be incorporated by reference into a will so as to control the disposition of the testator's estate. *Nash* v. *Danbury National Bank*, 138 Conn. 676, 683, 88 A.2d 397. Under no circumstances can the articles of incorporation be examined to show an intent not expressed in the will or to insert a devise or bequest not found therein. *Bryan* v. *Bigelow*, 77 Conn. 604, 614, 60 A. 266. They may, however, be used to identify the class of beneficiaries for whom the charitable trust was set up as well as to interpret, though not to alter, the doubtful language of which the testator made use in provision (5). *Seymour* v. *Sanford*, 86 Conn. 516, 521, 86 A. 7; for cases where corporate charters or by-laws were examined or referred to, see *Lyme High School Assn.* v. *Alling*, 113 Conn. 200, 203, 154 A. 439; *Dwyer* v. *Leonard*, 100 Conn. 513, 517, 124 A. 28; *Eccles* v. *Rhode Island Hospital Trust Co.*, 90 Conn. 592, 599, 98 A. 129; *Shepard* v. *Shepard*, 57 Conn. 24, 27, 17 A. 173. The distinction to be drawn is between provisions in an extrinsic paper which are descriptive and those which are dispositive. If they are of the

latter class, they cannot be utilized. *Phelps* v. *Robbins,* 40 Conn. 250, 271. In the case at bar, they belong to the former. Indeed, it is indispensable in all cases where the gift, as here, is in trust for the "general purposes" of the corporate legatee that those purposes be examined in order to determine whether they are of such a nature as to make the gift valid as one for a charitable purpose. In view of the foregoing, the will must be read in the light of the general purposes of the home society, since it was these purposes, previously set forth at length, which the testator had in mind when creating the trust.

Turning, then, to the will itself to ascertain whether it discloses the general intent essential to the applicability of the doctrine, we note the following: In the first instance, the testator generously met his natural obligation towards his wife and his sister. Utilizing practically all of his estate, he established a trust fund for their life use. It was only upon their deaths that his executor was authorized to draw upon that fund to pay ten bequests to individuals, one of whom, by the way, was the pastor of his church. These legacies totaled $10,000, an amount which was but a minor part of the estate then available. His diversified plan for disposing of the balance speaks eloquently of the breadth and depth of his charitable impulses. After setting up a fund to care for the Ives burial lot, he made bequests, though modest in amount, to the Center Congregational Church, the Hopkins Grammar School, the Meriden Hospital, the Meriden Boys Club and the Meriden Y.M.C.A. He divided what was then left into two parts. The first he gave to the local Baptist church society, to which he belonged, in trust for the general purposes of the church; the other he

gave to the home society. It is thus seen that the ultimate devotion of his entire estate, other than the small fraction used to provide for the individual legacies referred to, was completely charitable in character. He wished to give practically everything he owned to aid the varied undertakings of charity, such as the relief of the poor, the comfort of the suffering, the education of youth, the furtherance of religion and the advancement of the welfare of boys. The extent of his generosity is a circumstance tending to manifest a general charitable intent. *Waterbury Trust Co.* v. *Porter,* 131 Conn. 206, 216, 38 A.2d 598; *Hartford National Bank & Trust Co.* v. *Oak Bluffs First Baptist Church,* 116 Conn. 347, 354, 164 A. 910.

We furthermore find that the will is devoid of anything indicating an intent in the testator to benefit his relatives and his friends beyond the small legacies which he set up for them. The will likewise shows a studied effort to dispose of every remaining part of his estate. By a general residuary clause, he obviously sought to avoid any intestacy. *Brinsmade* v. *Beach,* 98 Conn. 322, 330, 119 A. 233. It is safe to say that the possibility that by partial intestacy both his charitable purpose and his attempt to create a memorial to his parents might be defeated and that a substantial part of his estate might go, not to those of his own blood, but to the next of kin of his wife was furthest from his contemplation. *Citizens & Manufacturers National Bank* v. *Guilbert,* 121 Conn. 520, 526, 186 A. 564.

We also note that, in impressing a trust upon the gift to the home society, the testator directed that it be called "The John and Wealthy S. Ives Fund." This provision of the will, while of course not controlling on the question under discussion, does throw

additional light upon his intent. He was not selfishly concerned with attaching his own name to the gift. His object, attesting to the deep reverence in which he held them, was to perpetuate the memory of his parents. It is significant that of the eight bequests made to charitable institutions, only the gift to the home society was to bear the name of Ives. The dominant intent of the testator was to devote the gift to a charitable use through which he incidentally wished to pay honor to his father and mother, and his intent that it go to the home society was to him a matter of secondary importance. The cumulative effect of all of these considerations satisfies us that the case presents a situation where the doctrine of approximation applies.

If it were necessary, this conclusion could be fortified by reason of the unusual manner in which courts regard charitable gifts. Such gifts are highly favored and courts, while remaining within legal limitations, go to great lengths in sustaining legacies to charitable uses. *Coit* v. *Comstock,* 51 Conn. 352, 377. "Having a charitable purpose, the language used by the testator in his attempt to establish the trust and define its terms and conditions, should have such liberal and favorable construction as may be necessary to establish its validity and ascertain its meaning." *Hoyt* v. *Bliss,* 93 Conn. 344, 350, 105 A. 699.

The order of the Probate Court for the district of Meriden recited "that the Baptist Ministers' Home Society of Mt. Vernon, New York to which one-half of the rest, residue and remainder of said estate is given, devised and bequeathed by [Article] Third (g) of the will of the deceased was dissolved on or about June 10, 1941 and its corporate existence terminated; that thereby said bequest and devise

lapsed." There is nothing in the order to indicate that the Probate Court gave any consideration to the doctrine of approximation. If such was the fact and if this was due to the belief that its jurisdiction was not broad enough to permit it to pass upon the availability of the doctrine as a means of preventing the gift from lapsing, the Probate Court misconceived the extent of its power. In performing the duty of ascertaining the distributees of the estate, it had jurisdiction to determine such incidental questions as were necessary to a correct conclusion. General Statutes § 6813; *Culver* v. *Union & New Haven Trust Co.,* 120 Conn. 97, 102, 179 A. 487; *Chase National Bank* v. *Schleussner,* 117 Conn. 370, 376, 167 A. 808; *Eliot's Appeal,* 74 Conn. 586, 601, 51 A. 558; *Mack's Appeal,* 71 Conn. 122, 129, 41 A. 242. Under this rule, it was empowered to answer the question whether the doctrine of approximation was applicable, since it was a necessary and incidental issue requiring solution before the primary matter of distribution could be determined. If the Probate Court was satisfied that the will evidenced the essential general intent, to which we have referred, its answer would have been in the affirmative, leaving for future determination by a court of equitable jurisdiction the exact manner by which the purposes of the trust may be approximated. In view of our answers to the questions reserved, the duty of the Probate Court is now limited to the appointment of a substitute trustee (see *City Missionary Society* v. *Moeller Memorial Foundation,* 101 Conn. 518, 528, 126 A. 683) and to an order of distribution to that trustee.

To questions 1 and 2, we answer "No," and to questions 3 and 4, "Yes"; to question 8, we answer that the one-half interest should be distributed to

a substitute trustee to be named by the Probate Court; it is not necessary to answer questions 5, 6 and 7.

No costs will be taxed in this court to any party.

In this opinion the other judges concurred.