THEODORE D. LOCKWOOD ET AL. *v.* ROBERT K. KILLIAN, ATTORNEY GENERAL OF THE STATE OF CONNECTICUT, ET AL.

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and BARBER, JS.

Argued November 16, 1976—decision released March 8, 1977

*Richard J. Lynch,* assistant attorney general, with whom, on the brief, was *Bernard F. McGovern, Jr.,* assistant attorney general, for the appellant (named defendant).

*William G. DeLana,* with whom, on the brief, was *Paul C. Remus,* for the appellees (plaintiffs).

BARBER, J. The plaintiffs, members of the special selection committee of the Fuller Scholarship Fund, instituted this action for instructions from the Superior Court, claiming to be unable to perform their duties in the administration of the trust fund without the advice of the court. The plaintiffs allege that they had been unable to choose a sufficient number of beneficiaries to expend all the annual income of the Fuller Scholarship Fund because of racial, sexual or religious restrictions on beneficiaries of the fund. To avoid imposition of federal taxes under § 4942 of the Internal Revenue Code, the plaintiffs sought the removal of the

racial and sexual restrictions on beneficiaries, asking the court to decide whether such restrictions were impracticable and whether they were illegal. The attorney general, the only defendant to appear, filed a counterclaim requesting that the religious restriction be removed as well. The plaintiffs and the attorney general stipulated and agreed to the facts which they considered relevant.

Frank Roswell Fuller died a resident of West Hartford on March 1, 1957, leaving a will dated January 4, 1957, which was duly admitted to probate. Article X of the will establishes a charitable trust to grant college scholarships from the income of the fund to beneficiaries chosen by the special selection committee created for that purpose. The will designates the group from which beneficiaries may be chosen as "needy, deserving boys from the graduating classes of the preceding month of June from the high schools of the County of Hartford and State of Connecticut, whose high school marks for their individual and respective entire high school course shall have been at least an average of seventy (70) points out of a possible one hundred (100) points or better, who are members of the Caucasian race and who have severally, specifically professed themselves to be of the Protestant Congregational Faith." The will provides further that the special selection committee may choose only those applicants who meet the racial, sexual and religious restrictions set forth in article X. In every year from 1971 through 1973, the committee chose as beneficiaries all the applicants who met the qualifications set forth in article X of the will, but the committee has not been able to choose a sufficient number of beneficiaries to expend on scholarships for beneficiaries all the income of the

fund. The plaintiffs rely on churches, colleges and universities to publicize the availability of scholarships from the Fuller Scholarship Fund, but many of those institutions have refused to publicize the availability of such scholarships because of the racial, sexual or religious restrictions on the beneficiaries. The parties agreed that if the racial, sexual or religious restrictions are removed, the plaintiffs will be able to choose a sufficient number of beneficiaries for the trustees of the Fuller Scholarship Fund to expend all the annual income on scholarships for beneficiaries. The trial court applied the doctrine of cy pres or approximation to remove the racial and sexual restrictions on the beneficiaries of the scholarship fund. The court found, however, that the continued imposition of the religious restriction would not involve state action and, therefore, would not violate the fifth or fourteenth amendments of the constitution of the United States or the constitution of Connecticut, article first, § 20. The court further found that the removal of the racial and sexual restrictions on beneficiaries of the Fuller Scholarship Fund would allow the fund to attract a sufficient number of beneficiaries to award as scholarships all the fund's annual income, which was the general charitable intent of the testator, and that the continued imposition of the religious restriction would not impede this charitable intent. The court finally concluded that the religious restriction, being neither illegal nor impracticable, could not be removed through the application of the doctrine of cy pres or approximation. The defendant appealed from the judgment of the trial court and assigns as error the court's failure to remove the religious restriction on beneficiaries of the Fuller Scholarship Fund.

On appeal, the defendant argues that the judicial removal of the gender restriction and the concurrent judicial preservation of the religious restriction constitute state discriminatory action which is illegal.

## I

A trust for the advancement of education is charitable, and the beneficiaries of a charitable trust to provide scholarships generally may be limited to persons of a particular religion. Restatement (Second) 2 Trusts § 370, comment j; 4 Scott, Trusts (3d Ed.) § 370.6. "Indeed, the advancement of religion is one of the principal divisions of charitable trusts." 15 Am. Jur. 2d, Charities (Rev. 1976), § 39. See General Statutes § 47-2. As a charitable trust the Fuller Scholarship Fund must be construed so as to uphold it, if it is reasonably possible to do so. General Statutes § 45-79; *Connor* v. *Hart,* 157 Conn. 265, 275, 253 A.2d 9; *Waterbury Trust Co.* v. *Porter,* 131 Conn. 206, 214–15, 38 A.2d 598.

For the purposes of this case, the constitution of Connecticut, article first, § 20,[1] is the state counterpart of the equal protection clause of the fourteenth amendment to the constitution of the United States. These provisions of the federal and state constitutions "have the same meaning and impose similar constitutional limitations." *Karp* v. *Zoning Board,* 156 Conn. 287, 295, 240 A.2d 845. Both provisions therefore may be considered together. See *Page* v. *Welfare Commissioner,* 170 Conn. 258, 264, 365 A.2d 1118; *Tough* v. *Ives,* 162 Conn. 274, 292, 294

[1] Our state constitution, article first, § 20, as amended, provides that: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin or sex."

A.2d 67; *Proctor* v. *Sachner,* 143 Conn. 9, 17, 118 A.2d 621. The defendant correctly notes in his brief that while the fifth amendment of the United States constitution contains no equal protection clause, it has been held to forbid discrimination that is so unjustifiable as to be a violation of due process. *Schneider* v. *Rusk,* 377 U.S. 163, 168, 84 S. Ct. 1187, 12 L. Ed. 2d 218. "The approach to equal protection claims under the fifth or fourteenth amendments has always been precisely the same. *Weinberger* v. *Wiesenfeld,* 420 U.S. 636, 638 n.2, 95 S. Ct. 1225, 43 L. Ed. 2d 514." *Page* v. *Welfare Commissioner,* supra, 259 n.1. The defendant's brief, however, discusses only state, not federal, activity which might constitute "state action."

It has long been established that private conduct abridging individual rights does not violate the equal protection clause of the fourteenth amendment to the constitution of the United States. See *Civil Rights Cases,* 109 U.S. 3, 3 S. Ct. 18, 27 L. Ed. 835. The equal protection clauses of our state and federal constitutions are designed as a safeguard against acts of the state and do not limit the private conduct of individuals or persons. 16 Am. Jur. 2d, Constitutional Law, § 491. There is an "essential dichotomy between discriminatory action by the State, which is prohibited by the Equal Protection Clause, and private conduct, 'however discriminatory or wrongful,' against which that clause 'erects no shield,' *Shelley* v. *Kraemer,* 334 U.S. 1, 13 (1948) [68 S. Ct. 836, 92 L. Ed. 1161]." *Moose Lodge No. 107* v. *Irvis,* 407 U.S. 163, 172, 92 S. Ct. 1965, 32 L. Ed. 2d 627; *Burton* v. *Wilmington Parking Authority,* 365 U.S. 715, 81 S. Ct. 856, 6 L. Ed. 2d 45. Thus, private discriminatory action is not constitutionally proscribed, and for the defendant's

appeal to be sustained the trial court must have erred in concluding that the defendant had not shown any significant state involvement in either the creation, implementation or enforcement of the restrictive provisions of the Fuller Scholarship Fund. We are not persuaded that the trial court did so err.

In deciding whether the conduct under attack is governmental or private in nature, the United States Supreme Court has never adopted a precise, rigid test but has relied on a case-by-case approach. See, generally, note, "State Action and the Burger Court," 60 U. Va. L. Rev. 840; see also note, "State Action: Theories for Applying Constitutional Restrictions to Private Activity," 74 Col. L. Rev. 656. In a case involving the distribution of religious literature by a Jehovah's Witness on the sidewalk of a company-owned town, the court used a balancing approach when the company invoked the state trespass laws to prevent an activity that a municipal government could not impede without abridging the first amendment: "When we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion . . . we remain mindful of the fact that the latter occupy a preferred position." *Marsh* v. *Alabama,* 326 U.S. 501, 509, 66 S. Ct. 276, 90 L. Ed. 265. More recently, the court has again recognized the distinction between private and state activity and has offered further guidance: "[P]rivate conduct abridging individual rights does no violence to the Equal Protection Clause unless to some *significant extent* the State in any of its manifestations has been found to have become involved in it. . . . [T]o fashion and apply a precise formula for recognition of state responsibility under the

Equal Protection Clause is an 'impossible task' which 'This Court has never attempted.' *Kotch* v. *Pilot Comm'rs.*, 330 U.S. 552, 556 [67 S. Ct. 910, 91 L. Ed. 1093]. Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." (Emphasis added.) *Burton* v. *Wilmington Parking Authority*, supra, 722; *Moose Lodge No. 107* v. *Irvis*, supra, 172. Whether governmental authority is so significantly involved in nominally "private" actions as to constitute state action is a determination involving both the nature of the discrimination and the extent of the governmental involvement. See *Moose Lodge No. 107* v. *Irvis*, supra.

State action apparently will be found much more readily if racial discrimination is claimed, as opposed to any other form of discrimination. See *New York City Jaycess, Inc.* v. *United States Jaycees, Inc.*, 377 F. Sup. 481, 488, and n.30; note, Col. L. Rev., op. cit., 661. The Second Circuit Court of Appeals, in explaining the distinctions among cases in which state action was alleged, stated: "This dichotomy is explained in part by the double 'state action' standard which has been recognized—one, a less onerous test for cases involving racial discrimination, and a more rigorous standard for other claims." *Jackson* v. *Statler Foundation*, 496 F.2d 623, 629 (2d Cir.). The defendant objects to the trial court's preservation of a religious restriction established by the testator on the eligibility of beneficiaries under the Fuller Scholarship Fund. The first amendment to the constitution of the United States and the constitution of Connecticut, article first, § 3, both guarantee freedom of religion, and an individual's fundamental rights under the

religion clause have always been "zealously protected, sometimes even at the expense of other interests of admittedly high social importance." *Wisconsin* v. *Yoder,* 406 U.S. 205, 214, 92 S. Ct. 1526, 32 L. Ed. 2d 15. The basic principle governing state action in this area must be one of "benevolent neutrality": "Few concepts are more deeply embedded in the fabric of our national life . . . than for the government to exercise at the very least this kind of benevolent neutrality toward churches and religious exercise generally so long as none was favored over others and none suffered interference." *Walz* v. *Tax Commission,* 397 U.S. 664, 676, 90 S. Ct. 1409, 25 L. Ed. 2d 697. The defendant asserts that the court's removal of the religious restriction on the scholarship fund will not violate the free exercise clause because the fund is basically established to promote and foster education and not religion. This argument disregards the fact that one aspect of the constitutional guarantee of freedom of religion is the right to assure the future well-being of one's faith. See *Wisconsin* v. *Yoder,* supra. The testator's restriction of beneficiaries of his fund's scholarships to members of his own Congregational faith could work to assure the legitimate purpose that there would be well-educated and financially secure young followers to support the Congregational faith. Surely it cannot be said that any particular individual had a judicially recognizable "right" to the testator's charity, or an enforceable claim arising from the testator's "failure" to make a charitable gift to him. See *Jackson* v. *Statler Foundation,* supra, 640 (opinion of Friendly, J., dissenting).

Under the facts of this case, the defendant's claim that state action is involved in the private

discrimination of the testator is not persuasive, particularly in light of the testator's substantial interests deserving protection. It is true that the attorney general is a party to the action for instructions, but in Connecticut, as in most states, the attorney general is a necessary party in any litigation involving a public trust. *Copp* v. *Barnum,* 160 Conn. 557, 558, 276 A.2d 893; see 4 Scott, Trusts (3d Ed.) § 391. He is required by § 3-125 of the General Statutes to "represent the public interest in the protection of any gifts, legacies or devises intended for public or charitable purposes." If the mere fact of his official presence in this suit were enough to render the outcome "state" action, it is difficult to see how any restrictions in a charitable trust could be upheld. Nor was the court so significantly involved in the implementation of the religious restriction that it can be said that state action should be deemed responsible for what is essentially private discrimination from a private source. See *Burton* v. *Wilmington Parking Authority,* supra. The court did not create the religious restriction or independently substitute it as a condition of eligibility. The court merely applied neutral and nondiscriminatory principles of the doctrine of approximation in deleting two of the testator's restrictions and leaving the third. See *Evans* v. *Abney,* 396 U.S. 435, 446, 90 S. Ct. 628, 24 L. Ed. 2d 634. This was the extent of the court's involvement with the restrictive provisions of the fund. Two cases relied on by the defendant provide a clear contrast in the extent and nature of the state's involvement in, and responsibility for, discrimination which originated as private action. In *Bank of Delaware* v. *Buckson,* 255 A.2d 710 (Del. Ch.), the discrimination was a racial restric-

tion on scholarships. In addition to this especially suspect form of discrimination, the court found it significant that the testator's express intent was that state officials were to be "deeply involved" in the administration of the trust and were to form a majority of the committee selecting applicants for the trust's scholarships. Similarly, in the case of *In re Will of Potter,* 275 A.2d 574 (Del. Ch.), the racial restriction in the trust, legislative involvement, the active intervention of public officials, the 49 percent ownership by the state of Delaware of the Farmers Bank (the present trustee) are all factors clearly distinguishing the state action manifestly present in *Potter* from that in the present case. "The doctrine of state action must be subject to reasonable limitations. Quite obviously, the influence and beneficial activities of the State permeate virtually every area of human endeavor . . . [A]lmost everything we do is in part the product of or is facilitated by some State action." *Pennsylvania* v. *Brown,* 270 F. Sup. 782, 788 (E.D. Pa.), aff'd, 392 F.2d 120 (3d Cir.), cert. denied, 391 U.S. 921, 88 S. Ct. 1811, 20 L. Ed. 2d 657. In the present case, the necessary participation in the action for instructions by the attorney general, who does not seek to maintain the religious restriction, and the impartial application of the doctrine of approximation by the trial court, do not amount to such significant state action within the purview of the equal protection clause as will shift the responsibility for the testator's private discrimination to the state. See *Burton* v. *Wilmington Parking Authority,* supra; *Moose Lodge No. 107* v. *Irvis,* supra. "[T]here is nothing approaching the symbiotic relationship between lessor and lessee that was present in *Burton,* where the private lessee obtained the

benefit of locating in a building owned by the state-created parking authority, and the parking authority was enabled to carry out its primary public purpose of furnishing parking space by advantageously leasing portions . . . to commercial lessees." *Moose Lodge No. 107* v. *Irvis,* supra, 175.

Upon the limited stipulation of facts the court did not err in concluding that the religious restriction of the trust was neither illegal nor impracticable.

## II

Although we have determined the issues raised by the parties, there remains a further issue with which this court is concerned. That issue arises out of the removal of the gender restriction, upon a limited stipulation of agreed facts. The basic problem in this case involves the application of surplus funds. See Restatement (Second) 2 Trusts § 400. Where the doctrine of approximation is applicable, it will be applied "just as nearly as may be to effectuate the intent of the testator"; *Shannon* v. *Eno,* 120 Conn. 77, 89, 179 A. 479; 15 Am. Jur. 2d, Charities (Rev. 1976), § 171; and in the case of disposing of surplus funds, "the court will ordinarily approve the framing of a scheme, as it does where the particular purpose of the testator is or becomes impossible of accomplishment." 4 Scott, Trusts (3d Ed.) § 400, p. 3134; see *Hoyt* v. *Bliss,* 93 Conn. 344, 353, 105 A. 699 (surplus income properly authorized to increase the number of individual beneficiaries of the trust).

A proper application of the doctrine of approximation requires the court to consider not only the language used in creating the trust but, if neces-

sary, extrinsic facts as well. *Ministers Benefit Board* v. *Meriden Trust Co.,* 139 Conn. 435, 444, 94 A.2d 917; Restatement (Second) 2 Trusts § 399, comment (d). Neither the trustees; *Seymour* v. *Attorney General,* 124 Conn. 490, 499, 200 A. 815; nor the attorney general; *Town of Brookline* v. *Barnes,* 327 Mass. 201, 207–208, 97 N.E.2d 651; has the power to control the disposition of surplus funds. *Veterans' Industries, Inc., of Long Beach, California* v. *Lynch,* 8 Cal. App. 3d 902, 919–20, 88 Cal. Rptr. 303; 4 Scott, op. cit. § 399. It is for the court to determine upon all the evidence what application should be made of surplus funds under the doctrine of approximation. *Town of Milton* v. *Attorney General,* 314 Mass. 234, 240, 49 N.E.2d 909. In doing so a court must not do violence to General Statutes § 45-79 which provides that such a charitable trust as this "to acquire education, shall forever remain to the uses and purposes to which it has been granted according to the true intent and meaning of the grantor and to no other use."

The court in its memorandum of decision after noting that "[t]he removal of the racial and sexual restrictions will accomplish the necessary result" stated that "[w]hether or not the same result could have been achieved by the broadening of the geographical base from Hartford County need not be here considered by the court *in view of the fact that the parties have restricted the factual foundation by the stipulation of facts submitted to the court.*" (Emphasis added.) It is significant that the complaint alleges that the "[p]laintiffs rely on churches, colleges and universities to publicize the availability of scholarships from the Fuller Scholarship Fund" and that "[t]he said racial and sexual restrictions have frustrated and continue to frustrate the gen-

eral charitable intention of Frank Roswell Fuller."
The defendant pleaded no knowledge to the former
allegation, but admitted the truth of the latter. The
stipulation of the parties included the verbatim alle-
gation of the complaint pertaining to the publicizing
of the scholarships and concluded that the removal
of the racial and sexual restrictions will allow the
fund to attract a sufficient number of applicants to
award all the annual income as scholarships.

The court was obviously relying upon a restric-
tive stipulation of facts with no apparent adversary
proceedings or investigation by the court or evi-
dence as to what might be a proper scheme to carry
out the purpose of the trust. It does not appear
what the situation would be, for instance, if the
trustees did not just rely on schools and colleges to
publicize the availability of the scholarships but
themselves publicized and advertised the availability
of scholarships, or if only the racial restriction
were removed, or if the geographical base were
broadened.

Because the judgment of the trial court was predi-
cated solely upon such a limited stipulation of facts,
with no evidence whatsoever to establish to the satis-
faction of the court the actual existence of those
facts or what alternate scheme might be a sufficient
deviation to carry out the proper purposes of the
trust, we are constrained to hold that the court erred
in proceeding upon the restrictive stipulation of
facts, without further evidence or investigation.

There is error, the judgment is set aside and a
new trial ordered.

In this opinion HOUSE, C. J., LOISELLE and LONGO,
Js., concurred.

BOGDANSKI, J. (concurring in part and dissenting in part). The trial court was correct in removing the racial and sexual restrictions on the beneficiaries of the Fuller Scholarship Fund; it erred, however, in refusing to remove the religious restriction.

Article first, § 20, of the Connecticut constitution, as amended, provides that: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin or sex." The guarantee of equal protection is "aimed at undue favor and individual or class privilege, on the one hand, and at hostile discrimination or the oppression of inequality, on the other." *Truax* v. *Corrigan,* 257 U.S. 312, 332–33, 42 S. Ct. 124, 66 L. Ed. 254. The equal protection provisions of the federal and state constitutions "have the same meaning and impose similar constitutional limitations." *Karp* v. *Zoning Board,* 156 Conn. 287, 295, 240 A.2d 845; *Cyphers* v. *Allyn,* 142 Conn. 699, 703, 118 A.2d 318.

Pursuant to § 45-100*o,* of the General Statutes, as amended, Public Acts 1973, No. 73-548, § 7, the plaintiffs came to court seeking the removal of the racial and sexual restrictions. When such relief is sought, the law mandates the involvement of both the attorney general and the Superior Court. In response to the complaint, the attorney general filed a counterclaim requesting the court also to remove the religious restriction. The plaintiffs contested the relief sought in the counterclaim.

The attorney general is required by § 3-125 of the General Statutes to "represent the public inter-

est in the protection of any gifts, legacies or devises intended for public or charitable purposes." The attorney general's role in this case is sufficient alone to constitute state action. Of equal significance is the involvement of the judiciary. "That the action of state courts and of judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court." *Shelley* v. *Kraemer,* 334 U.S. 1, 14, 68 S. Ct. 836, 92 L. Ed. 1161. The judicial act of the highest court in the state, in authoritatively construing and enforcing its laws, is the act of the state. *Shelley* v. *Kraemer,* supra, 15; *Twining* v. *New Jersey,* 211 U.S. 78, 90–91, 29 S. Ct. 14, 53 L. Ed. 97.

The retention of the religious restriction by the court can only be viewed as governmental approval of private discrimination. The claim that private discrimination is constitutionally protected must give way to the no less legitimate claim that the state is constitutionally prohibited from engaging in discriminatory conduct or encouraging private parties to discriminate. That constitutional prohibition ensures that private conduct inconsistent with public policies, while free to continue, will not receive official encouragement.

A testatrix devised her estate to Stanford University School of Medicine for the establishment of a doctoral fellowship subject to the following provision: "Recipients must be of the white race, protestant religion, and citizens of the United States, Canada, England, Scotland, Ireland, or Wales." The university would not accept the legacy and requested the court to delete the religion

requirement. The attorney general urged that the race requirement be stricken also. The court ordered removal of all restrictive provisions saying that the court could not lend its hand in aid of discrimination; that an individual trustee was constitutionally free, as a private individual, to discriminate, but the court is not; that state courts cannot promote or give effect to private contracts that deny the equal protection of the laws. *In re Estate of Ruth Snively Walker,* No. 71095, California Superior Court, Santa Barbara County, April 23, 1965; *Shelley* v. *Kraemer,* supra. There is ample authority to permit a court to carry out a testator's general charitable intent notwithstanding the need to repudiate the decedent's intent with reference to some factor of lesser significance. *Estate of Tarrant,* 38 Cal. 2d 42, 237 P.2d 505; *Estate of Loring,* 29 Cal. 2d 423, 175 P.2d 524.

Were the present scholarship fund a noncharitable trust, the sexual, racial and religious restrictions would be protected from state interference. The scholarship fund here, however, is conceded to be a charitable educational trust. A charitable trust is one which performs some governmental function, such as fostering education, relief of poverty, care of the sick or aged, burial of the dead, or performs some other public task which relieves the governmental burden of the state. Because charitable trusts perform such governmental duties, they are accorded state recognition and protection, and receive the benefit of state and federal tax exemptions as well as numerous other special statutory privileges.

Because charitable trusts are dedicated to the public interest, state action by both the attorney general and the courts is required before any modi-

fication of their provisions can be made. When modifications are sought, as in this case, which involve the retention of a discriminatory restriction, the attorney general and the court, in approving such a modification, would be lending the power of the state in aid of discrimination. While an individual trustee is constitutionally free, as a private individual, to discriminate, the court never is. In fact, courts cannot promote or give effect to private contracts, let alone public charities, that deny equal protection of the laws. *Shelley* v. *Kraemer, supra.*

The power to dispose of property at death is a privilege granted by law, supervised through probate and administered by courts and judicially appointed fiduciaries. While these incidents of ministerial control have been thought too slight to constitute state action, the state's role in a charitable trust is all this and much more: The trust becomes operative only after a court has found, either specifically or by inference, that it is charitable. The state bestows privileges, of which tax immunity is only one. It creates and defines charitable trusts, grants them perpetual existence, modernizes them through the cy pres doctrine, appoints and regulates the trustees, approves accounts, construes ambiguous language and sometimes imposes a less stringent standard of tort liability on such trusts than on their private counterparts. 2A Bogert, Trusts and Trustees § 401; Clark, "Charitable Trusts, the Fourteenth Amendment and the Will of Stephen Girard," 66 Yale L.J. 979. These are practical benefits, granted or withheld by action of government.

But state action does not end with the conferral of those benefits. Accountability to somebody is required. Some entity is needed to protect the public

and bring the trustee before the court for an accounting. All the states in this country, either by statute or decision, have vested that responsibility for enforcement in a governmental official, usually the attorney general. 2A Bogert, Trusts and Trustees § 411.

Accordingly, the administration of a charitable trust is always characterized as state action. Basic to the grant of enforcement powers to the attorney general is the law's recognition that the words of the dead are only as effective as living society, acting through its governmental agents, chooses to make them. And while a living person may use his property to indulge his discriminatory purposes, he should not be allowed to force the state to effectuate post-death public purposes undermining the standards of society. As Mr. Justice Black once said of the rights of property: "The more an owner . . . opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Marsh* v. *Alabama,* 326 U.S. 501, 506, 66 S. Ct. 276, 90 L. Ed. 265.

Moreover, the court's removal of the religious restriction will not inhibit the practice of one's religious belief nor pose any threat to the religious faith involved in this case. It is undisputed that this is an educational trust. The removal, therefore, of the religious restriction would not interfere with the settlor's principal intent of fostering education and would not violate the first amendment free exercise clause. The restriction pertains merely to qualifications for scholarships: it does not rise to the level of constitutional concern. That religious restrictions are as unlawful as racial restrictions has been clearly established by the action of Con-

gress in enacting the Civil Rights Act of 1964.
42 U.S.C. § 2000e-2. None of those statutes has been
found invalid. See *In re Hawley's Estate,* 32
Misc. 2d 624, 223 N.Y.S.2d 803; *Howard Savings
Institution* v. *Peep,* 34 N.J. 494, 498, 170 A.2d 39.

On September 28, 1967, in light of Public Acts
1967, No. 636 (General Statutes §§ 2-53a, 2-53b,
2-53c, 31-122, 31-123), the governor of Connecticut
issued the following executive order: "No State
facility shall be used in the furtherance of any dis-
criminatory practice, nor shall any State agency
become a party to any agreement, arrangement or
plan which has the effect of sanctioning discrim-
inatory practices."

I would find error, set aside the judgment and
remand the case with direction to render judgment
as on file except that it should also reflect as being
in favor of the attorney general on his counterclaim.