THEODORE D. LOCKWOOD ET AL. *v.* ROBERT K. KILLIAN, ATTORNEY GENERAL OF THE STATE OF CONNECTICUT

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued June 13—decision released September 4, 1979

*Allan B. Taylor,* for the appellants (plaintiffs).

*Richard J. Lynch,* assistant attorney general, with whom were *Bernard F. McGovern,* assistant attorney general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellee (defendant).

*Phyllis Gelman, Susan R. Meredith* and *Patricia Smith* filed a brief as amici curiae.

LOISELLE, J. The plaintiffs are members of a special selection committee of the Fuller Scholarship Fund. In 1974, they instituted an action for instructions from the Superior Court, claiming to be unable to perform their duties in the administration of the trust fund without advice from the court. Acting upon a stipulation of facts, the court removed some, but not all,[1] of the restrictions on

---

[1] The Superior Court removed the racial and gender restrictions, but left the religious and geographical ones.

the beneficiaries of the fund. In *Lockwood* v. *Killian,* 172 Conn. 496, 375 A.2d 998 (1977) (hereinafter *Lockwood I),* this court remanded the case for a new trial because the judgment of the trial court was "predicated solely upon such a limited stipulation of facts, with no evidence whatsoever to establish to the satisfaction of the court the actual existence of those facts or what alternate scheme might be a sufficient deviation to carry out the proper purposes of the trust." *Lockwood I,* supra, 509.

On retrial, the Superior Court not only considered the stipulation of facts but also heard testimony from a number of witnesses who were subject to cross-examination by the defendant and to interrogation from the bench. The trial court modified the provision of the trust, through the doctrine of cy pres, in a totally different way—it left the racial, gender and religious restrictions and removed the geographical ones. All parties attacked this second judgment.

As a threshold matter, the plaintiffs claim that the remand on the previous appeal was limited to the question of whether the gender restriction should be removed. This court found that the trial court in *Lockwood I* erred in "proceeding upon the restrictive stipulation of facts, without further evidence or investigation." *Lockwood I,* supra, 509. The remand was as follows: "[T]he judgment is set aside and a new trial ordered." It is obvious from the body of the opinion and the wording of the remand that there was no limitation in the order of a new trial. See *Nowell* v. *Nowell,* 163 Conn. 116, 121, 302 A.2d 260 (1972).

Frank Roswell Fuller died a resident of West Hartford, Connecticut, on March 1, 1957, leaving a

will which is the subject of this appeal. Article VI of the will provides $10,000 in trust to the town of East Hartford to establish a scholarship fund for students at the East Hartford high schools. At the end of twenty-five years, the remainder of that fund is to be paid to the Newington Home for Crippled Children. Article VIII of the will provides funds for the maintenance of Fuller family plots in cemeteries located in Hartford County. Article IX of the will provides bequests in the total amount of $50,000 to four charitable corporations which are located in Hartford County. The beneficiaries of those bequests are not limited by either race or sex.

This appeal arises out of an action for instructions concerning the trust established in article X of the will.[2] The stated purpose of the trust is to use the income of the Fuller Scholarship Fund to award college scholarships to beneficiaries chosen by a special selection committee. Under the will, only needy and deserving caucasian boys graduating from high schools in Hartford County who profess themselves to be Protestant Congregationalists are eligible.

The trust created under article X first came before the Superior Court in 1966, when the restriction as to the number of new scholarships that could

---

[2] Article X d. 1. of the will reads as follows:

"1. On or before the last day of August of each calendar year . . . the special committee . . . shall select several needy, deserving boys from the graduating classes of the preceding month of June from the high schools of the County of Hartford and State of Connecticut, whose high school marks for their individual and respective entire high school course shall have been at least an average of seventy (70) points out of a possible one hundred (100) points or better, who are members of the Caucasian race and who have severally, specifically professed themselves to be of the Protestant Congregational faith . . . ."

be issued annually was removed.[3] Subsequently, the plaintiffs administered the trust and in every year from 1971 to 1975 chose as beneficiaries all the applicants who met the qualifications set forth in article X. Nevertheless, the committee was not able to choose a sufficient number of beneficiaries to expend the annual income of the trust on scholarships. This precipitated the present action.

At the first trial, the court removed the racial and gender restrictions but allowed the religious restriction to remain. On appeal, this court remanded the case for a new trial. See *Lockwood I,* 172 Conn. 496, 375 A.2d 998 (1977). At the second trial, the court chose not to modify the restrictions as to race, sex or religion but rather extended the geographical limits from which beneficiaries could be chosen to the entire state of Connecticut. It also increased the amount that could be spent in the administration of the fund from $4000 to $10,000 annually. This increase was to enable the administrator to publicize the scholarships on a statewide basis. It is probable that this decision was influenced in part by this court's opinion in *Lockwood I* where we alluded to the possibility of broadening the geographical base and suggested that more widespread publicity also might produce a sufficient number of eligible candidates. We did not pass on either possibility at that time because of the limited factual foundation in the stipulation of facts.

The finding of facts by the court in the present action, which is not attacked by anyone, is based upon, but does not follow verbatim, the stipulation of facts and the additional testimony that was

---

[3] *Connecticut Bank & Trust Co.* v. *Mulvey,* Superior Court, Hartford County, No. 141924 (September 9, 1966).

taken. It is unquestioned that the restrictions make it impossible to choose a sufficient number of recipients. It is also unquestioned that the provisions of article X of the Fuller will created a charitable trust, the dominant intent of which was to provide higher education for deserving recipients. The size of the trust established by the will, the fact that the scholarship fund received all of the residuary estate with no gift over in case the trust fund failed, the testator's affirmation that individual bequests fully satisfied his obligations to his family, and the magnitude of the other charitable bequests support the court's finding of a general charitable intent. See *Ministers Benefit Board* v. *Meriden Trust Co.*, 139 Conn. 435, 94 A.2d 917 (1953). The restrictions established as to number, race, sex, religion, geographic area and cost of administration were all subordinate to the general intent of providing further education to high school graduates. As all of these restrictions cannot be practically exercised and still carry out the dominant intent of the testator, the doctrine of approximation is applicable. *Second Ecclesiastical Society* v. *Attorney General*, 133 Conn. 89, 94, 48 A.2d 266 (1946) ; *Shannon* v. *Eno*, 120 Conn. 77, 88, 179 A. 479 (1935) ; *Newton* v. *Healy*, 100 Conn. 5, 10, 122 A. 654 (1923). In exercising its powers under the doctrine of approximation (cy pres), a court must seek a method or result which as nearly as possible effectuates the intent of the testator. *Shannon* v. *Eno*, supra, 89; 15 Am. Jur. 2d, Charities § 171. In doing so, the court must observe the mandate of General Statutes § 45-79, which regulates charitable trusts, that the trust "shall forever remain to the uses and purposes to which it has been granted according to the true intent and meaning of the grantor and to no other use."

The trial court on remand concluded that the geographical restriction was of lesser importance than the race, sex or religion restrictions. This conclusion is not supported by the subordinate facts found. Nearly all the objects of the testator's bounty are in Hartford County. The will specifically restricts the recipients to high school graduates from Hartford County. Any college a recipient wants to attend has to be within a certain radius of West Hartford. A provision in the will makes it clear that the fund is not expressly for students from Trinity College but for applicants "from the whole area *in this section of Connecticut, as indicated hereinabove.*" (Emphasis added.) A specific finding of fact recites that the will "does not contain any bequest to a charitable or noncharitable corporation or organization that is not located in the County of Hartford, nor does it contain any bequest to a municipal corporation that is not located in the County of Hartford." There is no finding of fact, nor does the will itself indicate, that the testator's generosity was to be applied in any form to any other geographical area than Hartford County, for which, as indicated by his will, he had an exceedingly strong attachment. Further, if the other restrictions are to remain, as in the plan outlined by the trial court, expanding the geographical area will not appreciably increase applications, since one of the main stumbling blocks was that the religious and educational leaders involved refused to publicize the scholarships because of their racial and sexual taint. The court's conclusion that the geographical restriction was not a vital element to the testator's intent is not supported by the finding and is in error. *White Oak Excavators, Inc.* v. *Board of Tax Review,* 169 Conn. 253, 256, 363 A.2d 134 (1975).

The court's conclusion that the $4000 provided for administration of the fund is inadequate appears to be inextricably tied to its conclusion that the expansion of the geographical area will best effectuate the testator's intent. The only findings applicable to this conclusion are: "The restrictions [sic] contained in Article X, paragraph d.4 of the Will that the Special Selection Committee not expend more than four thousand dollars ($4,000) for administration is insufficient to allow the retention of a person to promote the availability of the Fuller Scholarship Fund and solicit applicants," and "inflation has substantially reduced the real value of the $4,000 allowed for administrative expenses . . . with regard to the amount of administrative services its expenditure may procure." There are no findings of fact to show how much the "real value" was "reduced" or to support the $10,000 figure that the court concluded was needed. The amount provided for administration expenses should not be expanded since the trial court's conclusion as to the inadequacy was based on the elimination of the geographical restriction. *Paul Bailey's, Inc.* v. *Commissioner of Motor Vehicles,* 167 Conn. 493, 499, 356 A.2d 114 (1975).

Since we have determined that the trial court's findings do not support the conclusion that the testator's intent can be effectuated by eliminating the geographical restrictions, we must now turn to a consideration of the effect of eliminating the race, gender and religion restrictions. In examining the will, it is evident that the testator was more concerned with the religious restriction than with those of race or gender. He gave $20,000 to the Immanuel Congregational Church in Hartford, he made the executive operational head of the Connecticut

Conference of Congregational Christian Churches one of the five members of the special selection committee and, most importantly, in restricting the recipients to members of the Protestant Congregational faith, the testator required that they "specifically professed themselves" to be of that faith before they could be considered.

It becomes apparent from reading the will that the race and gender restrictions are of less importance to furthering the intent of the testator than the religious and geographical restrictions. The word "Caucasian" only appears in the will once. The trust fund created for pupils of the East Hartford high schools and the bequest to the Trinity College scholarship fund were not restricted as to race or gender. None of the other bequests of a charitable nature restricted the beneficiaries as to race or gender. It is significant that the testator uses the words "his," "her" and "their" to delineate the recipients.[4] It is also noteworthy that in the same article of the will which created the trust, the special selection committee is allowed to hire as a manager "a person with knowledge and understanding of the educational and vocational problems of *young people* attempting to secure proper college education." (Emphasis added.)

The will must be interpreted as a whole in order to understand the intent of the testator; random words and phrases cannot be construed in isolation. *Colonial Bank & Trust Co.* v. *Stevens*, 164 Conn.

---

[4] In the very first pargraph that follows the setting up of the scholarships trust in article X of the will, the testator provides the income of the trust for the expenses of a college education for the time "the student is enrolled for his or her or their college courses" plus weekly spending money during each of the weeks of the academic year he, she or they are so enrolled as students.

31, 36–37, 316 A.2d 768 (1972). In light, however, of the careful attention to drafting and detail so manifest throughout the will, it is not likely that these references to young people and female recipients would have been permitted to remain in the will if the restriction to "Caucasian males" were a vital element of the testator's intent.

Between the time the Superior Court rendered its first judgment in this case and this court's opinion in *Lockwood I,* the special selection committee selected recipients without regard to race or sex. The number of eligible beneficiaries was large enough to meet the minimum requirements established by § 4942 the Internal Revenue Code of 1954 (as amended). See *Lockwood I,* 172 Conn. 496, 497, 375 A.2d 998 (1977). Since this court's opinion in *Lockwood I,* the special selection committee has been unable to attract sufficient applicants for scholarships and, from a practical aspect, will continue to be unable to attract them until the racial and gender restrictions are eliminated. This is due largely to the reluctance and refusal of ministers of the Congregational faith and educators in the eligible colleges and universities to publicize the availability of these racially and sexually biased scholarships.

It is evident that the doctrine of approximation must be invoked to carry out the dominant intent of the testator. It is also evident that the removal of the racial and gender restrictions would have the least effect on the testator's intent. Experience has proved that the removal of these two restrictions, without the removal of the religious restriction, is sufficient. It is apparent from the attitude of the educators and ministers involved as expressed at

the trial that it is the racial and gender restrictions that constitute the stumbling block. Further, the testator's will makes it clear that the religious restriction was more vital to his intent than that of race or gender. As the removal of the racial and gender restrictions will suffice to fulfill the dominant intent of the testator, there exists no basis for removing the religious restriction.

The attorney general makes a strong plea for the removal of the religious restriction on the basis of both legal grounds and public policy. This claim was reviewed in *Lockwood I*. At this time, this court reaffirms what it stated in the majority opinion in *Lockwood I*, supra, 500–507.

The result of this opinion is in effect an approval of the first judgment of the Superior Court. The holding in our first opinion was that we could not determine the issues presented because the factual foundation was insufficient. At the second trial, that foundation was provided. Although the trial court may have been misled by our first opinion, the evidence presented in addition to the stipulation of facts supported the prior judgment of the Superior Court.

There is no error in the finding of fact by the court and it is unlikely that another trial would materially change the finding of fact in the present record. Thus, a directed judgment in the present case will resolve the issue presented.

There is error, the judgment is set aside and the case is remanded with direction to render judgment in accordance with this opinion.

In this opinion COTTER, C. J., LONGO and PETERS, Js., concurred.

BOGDANSKI, J. (dissenting). I cannot comprehend how this court can say that there exists no basis for removing the discriminatory religious restriction from this trust when the court has just ruled, as a matter of law, that the racial and sexual restrictions, also present in this trust, must be removed.

In *Lockwood* v. *Killian*, 172 Conn. 496, 375 A.2d 998, this court explicitly recognized that the application of the doctrine of cy pres is a power of the court and that in such a situation neither the trustees nor the attorney general have the power to control the disposition of the funds at issue.

In the present case this court has acted to remove two of the three discriminatory restrictions in order to permit the trust to continue to function and to retain its status as a charitable trust. By retaining the religious restriction present in this trust, this court has clearly involved the state in sanctioning and enforcing private discrimination. The failure of this court to remove this religious restriction is thus clearly offensive to the fourteenth amendment of the United States constitution and to article first, § 20 of the constitution of this state. *Shelley* v. *Kraemer*, 334 U.S. 1, 14, 68 S. Ct. 836, 92 L. Ed. 1161.

It is beyond dispute that the furtherance of religion has always been regarded as a public good and as a proper purpose for a charitable trust. I concede that if the purpose of the present trust were primarily religious there would be no constitutional difficulty with the maintenance of the restriction in question. The difficulty is that the purpose of the present trust is not the furtherance of religion but is rather the providing of educational assistance to deserving and needy young persons. In a charitable trust, the purpose of which is the furtherance of

education, discriminatory criteria for eligibility, such as are involved here, are clearly violative of the fourteenth amendment and no distinction can be made between the racial and sexual restrictions on the one hand, and the equally discriminatory religious restriction on the other. Roy M. Adams, "Racial and Religious Discrimination in Charitable Trusts: A Current Analysis of Constitutional and Trust Law Solutions," 25 Clev. St. L. Rev. 1, 20.

Moreover, the removal by this court of this religious restriction will not inhibit the practice of any person's religion nor pose any threat to the religious faith involved in this case; neither will the removal of this restriction in any manner interfere with the settlor's principal intent of fostering education.

Article first, § 20 of the Connecticut constitution, as amended, provides that: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin or sex." The guarantee of equal protection is "aimed at undue favor and individual or class privilege, on the one hand, and at hostile discrimination or the oppression of inequality, on the other." *Truax* v. *Corrigan,* 257 U.S. 312, 332–33, 42 S. Ct. 124, 66 L. Ed. 254. The equal protection provisions of the federal and state constitutions "have the same meaning and impose similar constitutional limitations." *Karp* v. *Zoning Board,* 156 Conn. 287, 295, 240 A.2d 845; *Cyphers* v. *Allyn,* 142 Conn. 699, 703, 118 A.2d 318.

The attorney general is required by § 3-125 of the General Statutes to "represent the public interest in the protection of any gifts, legacies or devises

intended for public or charitable purposes." To my mind, the attorney general's role in this case is, of itself, sufficient to constitute state action. Of greater significance, however, is the current involvement of the judiciary. "That the action of state courts and judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court." *Shelley* v. *Kraemer,* 334 U.S. 1, 14, 68 S. Ct. 836, 92 L. Ed. 1161. The judicial act of the highest court in the state, in authoritatively construing and enforcing its laws, is the act of the state. *Shelley* v. *Kraemer, supra,* 15; *Twining* v. *New Jersey,* 211 U.S. 78, 90–91, 29 S. Ct. 14, 53 L. Ed. 97.

The retention by this court in a cy pres action of a discriminatory religious restriction can only be viewed as governmental approval of private discrimination. The claim that private discrimination is constitutionally protected must give way to the no less legitimate claim that the state is constitutionally prohibited from engaging in discriminatory conduct or encouraging private parties to discriminate. That constitutional prohibition ensures that private conduct inconsistent with public policies, while free to continue, will not receive official encouragement.

In the case of *In re Estate of Ruth Snively Walker,* No. 71095, California Superior Court, Santa Barbara County, April 23, 1965, a testatrix devised her estate to Stanford University School of Medicine for the establishment of a doctoral fellowship subject to the following provision: "Recipients must be of the white race, protestant religion, and citizens of the United States, Canada, England, Scotland,

Ireland, or Wales." The university would not accept the legacy and requested the court to delete the religion requirement. The attorney general urged that the race requirement be stricken also. The court ordered removal of all restrictive provisions saying that the court could not lend its hand in aid of discrimination; that, while an individual trustee was constitutionally free, as a private individual, to discriminate, the court is not; and that state courts cannot promote or give effect to private contracts that deny the equal protection of the laws. *In re Estate of Ruth Snively Walker*, supra; *Shelley* v. *Kraemer*, supra.

I note at this point that were the present scholarship fund simply a private trust, the sexual, racial and religious restrictions would be protected from state interference. The scholarship fund here, however, is conceded to be a *charitable* educational trust. A charitable trust is one which performs some public function and thereby relieves the governmental burden of the state. Because charitable trusts perform such governmental duties, they are accorded state recognition and protection, and receive the benefit of state and federal tax exemptions as well as numerous other special statutory privileges.

Because charitable trusts are dedicated to the public interest, action by both the attorney general and the courts is required before any modification of their provisions can be made. When modifications are sought, as in this case, which involve the retention of a discriminatory restriction, the attorney general and the court, in approving such a modification, would be lending the power of the state in aid of discrimination. *Shelley* v. *Kraemer*, supra.

The power to dispose of property at death is a privilege granted by law, supervised through probate and administered by courts and judicially appointed fiduciaries. While these incidents of ministerial control, standing alone, have been thought too slight to constitute state action, the state's role in a charitable trust is all this and much more. The trust becomes operative only after a court has found, either specifically or by inference, that it is charitable. The state bestows privileges, of which tax immunity is only one. It creates and defines charitable trusts, grants them perpetual existence, modernizes them through the cy pres doctrine, appoints and regulates the trustees, approves accounts, construes ambiguous language and sometimes imposes a less stringent standard of tort liability on such trusts than on their private counterparts. 2A Bogert, Trusts and Trustees § 401; Clark, "Charitable Trusts, the Fourteenth Amendment and the Will of Stephen Girard," 66 Yale L.J. 979. These are practical benefits, granted or withheld by action of the state.

The involvement of the state does not, however, end with the conferral of those benefits. Accountability is also required. Some entity is needed to protect the public and bring the trustees before the court for an accounting. All the states in this country, either by statute or decision, have vested that responsibility for enforcement in a governmental official, usually the attorney general. 2A Bogert, Trusts and Trustees § 411.

Accordingly, the administration of a charitable trust is always characterized as state action. Basic to the grant of enforcement powers to the attorney general is the law's recognition that the words of

the dead are only as effective as living society, acting through its governmental agents, chooses to make them. While a living person may use his property to indulge his discriminatory purposes, he should not be allowed to force the state to effectuate, post-death, testamentary purposes undermining the standards of society. As Mr. Justice Black once said of the rights of property: "The more an owner . . . opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Marsh* v. *Alabama,* 326 U.S. 501, 506, 66 S. Ct. 276, 90 L. Ed. 265.

I must therefore dissent.